UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

RICHARD E. LYNCH,

      Petitioner,

v.                                           CASE NO. 6:09-cv-715-Orl-36DAB

SECRETARY, DEPARTMENT OF
CORRECTIONS, et al.,

      Respondents.
_____

**<u>ORDER</u>**

This case is before the Court on the Petition for Habeas Corpus Relief (Doc. No. 1)

filed by Richard E. Lynch.  Pursuant to the instructions of the Court, Respondents filed a

Response to Petition for Writ of Habeas Corpus (Doc. No. 18).  Thereafter, Petitioner filed

a Reply to the Response (Doc. No. 23).  As discussed hereinafter, the habeas petition is

denied in part and granted in part.

**I.**     **STATEMENT OF FACTS**

The factual and procedural history, as set forth by the Supreme Court of Florida, are

as follows:

       On March 23, 1999, a grand jury returned an indictment against
appellant, Richard Lynch, for two counts of first-degree premeditated
murder, one count of armed burglary of a dwelling, and one count of
kidnapping.  The indictment was the result of events that occurred on March
5, 1999, culminating in the deaths of Roseanna Morgan ("Morgan") and her
thirteen-year-old daughter, Leah Caday ("Caday").

On October 19, 2000, appellant pled guilty to all four counts of the indictment. Subsequently, the trial judge granted appellant's request to have the penalty phase conducted without a jury. During the penalty phase, the State produced a letter written by the appellant two days prior to the murders. In the letter, addressed to appellant's wife, Lynch admitted to having a "long affair" with Roseanna Morgan, which lasted from August 1998 until February 9, 1999. He detailed the affair and asked his wife to send copies of cards Morgan had written to Lynch and nude pictures Lynch had taken of Morgan to Morgan's family in Hawaii. Lynch wrote: "I want them to have a sense of why it happened, some decent closure, a reason and understanding. . . ."

The testimony elicited during the penalty phase regarding the events of March 5, 1999, included a tape of a telephone call that appellant made to the "911" emergency assistance service while still in the apartment where the murders occurred. On that tape, Lynch is heard admitting to the 911 operator that he shot two people at 534 Rosecliff Circle. He said he initially traveled to the apartment only to attempt to have Morgan pay a credit card debt, but resorted to shooting her in the leg and in the back of the head. He told the 911 operator that he had three handguns with him and that he shot Morgan in the back of the head to "put her out of her misery." Appellant also admitted to firing at the police when they first arrived on the scene.

As to Caday, appellant informed the 911 operator that he had held Caday at gunpoint while waiting for Morgan to return home. He related that she was terrified during the process prior to the shootings and asked him why he was doing this to her. Appellant admitted that he shot Caday, and said "the gun just went off into her back and she's slumped over. And she was still breathing for awhile and that's it." Appellant told the operator he planned to kill himself.

During the course of these events on March 5, 1999, appellant telephoned his wife three times from the apartment. His wife testified that during the first call she could hear a woman screaming in the background. Appellant's wife further testified that the screaming woman sounded "very, very upset." When Lynch called a second time, he admitted to having just shot someone.

Prior to being escorted from the apartment by police, Lynch also talked to a police negotiator. The negotiator testified that Lynch told her that during the thirty to forty minutes he held Caday hostage prior to the

shootings, Caday was terrified, he displayed the handgun to her, she was aware of the weapon, and appeared to be frightened. He confided in the negotiator that Caday had complied with his requests only out of fear. Finally, appellant described the events leading to Morgan's death by admitting that he had confronted her at the door to the apartment, shot her in the leg, pulled her into the apartment, and then shot her again in the back of the head.

Several of Morgan's neighbors in the apartment complex also testified as to the events of March 5, 1999. Morgan's neighbor across the hall[FN2] testified that she looked out of the peephole in her door after hearing the initial shots and saw Lynch dragging Morgan by the hands into Morgan's apartment. She further testified that Lynch knocked on the door to Morgan's apartment and said, "Hurry up, open the door, your mom is hurt." The neighbor testified that Morgan was screaming and was bloody from her waist down. Morgan's neighbor further testified that the door was opened, then after entering with Morgan, Lynch closed the door and approximately five minutes later she heard the sound of three more gunshots. A second neighbor in the apartment complex also testified that approximately five to seven minutes after she heard the initial gunshots, she heard three more.

> FN2. The neighbor lived in the apartment directly across the hall from Morgan's apartment in the same apartment building.

After his arrest, appellant participated in an interview with police in which he confessed to the murders. He again admitted the events of the day, telling police he showed Caday the gun and that she was very scared while they were waiting for Morgan to arrive home. He told the detective that Caday was afraid and that he was "technically" holding her hostage. He admitted to shooting Caday's mother, Morgan, four or five times in the presence of her daughter.

In his post-arrest interview, Lynch also admitted that he planned to show Morgan the guns he brought with him to let her know he possessed them, and to force her to sit down and be quiet. He told the detectives he did not know why he did not just leave the guns in his car.[FN3] He admitted shooting Morgan four or five times, dragging her into the apartment, and then shooting her in the back of the head with a different firearm.

> FN3. The detective conducting the interview with appellant testified that Lynch's car was parked down the street, around

the corner, and away from Morgan's apartment.  It could not
be seen from the apartment.

The State's final witness was the medical examiner who testified that
after receiving the gunshot wound, it probably would have taken "no more
than several minutes" for Caday to die.  On cross-examination, although he
conceded that it was possible that Caday could have died in less than one
minute from the wound, such was unlikely.  Finally, he also testified that
with the amount of blood loss suffered by Caday, she could have lost
consciousness within ten to twenty seconds.

The defense presented only one witness, a mental health expert.  She
related that she had diagnosed Lynch with schizoaffective disorder, a
condition which is a combination of schizophrenia and a mood disorder.
Further, she testified that she did not believe the letter appellant wrote two
days prior to the murders demonstrated an intent by Lynch to kill Morgan.
She concluded that appellant was under the influence of an extreme mental
and emotional disturbance on March 5, 1999, and that his psychotic process
substantially impaired his capacity to conform his conduct with the
requirements of the law.

The State attempted to rebut the defense mental health evidence
through the testimony of another mental health expert.  The State's expert
opined that Lynch suffered from a depressive disorder.  The State's expert
admitted that it was his opinion that on the day of the incident, appellant
was suffering emotional distress, but it was not extreme, and Lynch did not
lack the ability to conform his conduct to the requirements of the law.
Finally, the State's doctor opined that the letter appellant wrote prior to the
murders evidenced a murder-suicide plot.

After accepting written closing arguments and sentencing
recommendations and conducting a *Spencer*[FN4] hearing, the judge sentenced
appellant to death for the murders of Roseanna Morgan and Leah Caday.  He
found three aggravating factors as to the murder of Morgan: (1) the murder
was cold, calculated, and premeditated ("CCP") (given "great weight"); (2)
appellant had previously been convicted of a violent felony (given "moderate
weight"); and (3) the murder was committed while appellant was engaged
in committing one or more other felonies (given "little weight").  As to the
murder of Caday, the judge found (1) that the murder was heinous,
atrocious, or cruel ("HAC") (given "great weight"); (2) that appellant was

4

previously convicted of a violent felony (given "great weight"); and (3) that the murder was committed while appellant was engaged in committing one or more other felonies (given "moderate weight").  He also found one statutory and eight nonstatutory mitigators as to each murder.[FN5]

> FN4. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).
>
> FN5. The statutory mitigating factor found was that Lynch had no significant history of prior criminal activity (moderate weight).  The eight nonstatutory mitigators were: (1) the crime was committed while defendant was under the influence of a mental or emotional disturbance (moderate weight); (2) the defendant's capacity to conform his conduct to the requirements of law was impaired (moderate weight); (3) the defendant suffered from a mental illness at the time of the offense (little weight); (4) the defendant was emotionally and physically abused as a child (little weight); (5) the defendant had a history of alcohol abuse (little weight); (6) the defendant had adjusted well to incarceration (little weight); (7) the defendant cooperated with police (moderate weight); (8) the defendant's expression of remorse, the fact that he has been a good father to his children, and his intent to maintain his relationship with his children (little weight).

*Lynch v. State*, 841 So. 2d 362, 365-68 (Fla. 2003) (footnote omitted).

## II.   POST-CONVICTION PROCEDURAL HISTORY

On direct appeal, Petitioner raised five claims. (Ex. B.)[1]  The Supreme Court of Florida affirmed Petitioner's convictions and sentences.  *Lynch*, 841 So. 2d 362.  Petitioner filed a petition for writ of certiorari with the Supreme Court of the United States, which was denied.  (Ex. E-3.)

---

[1]References to the record will be made by citing to the particular volume and page of the advanced appendix.  For example, "Ex. A at 1" refers to page one of the volume labeled Exhibit A.

Petitioner filed a motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.851. (Ex. F-1 at 40-179.) The state court conducted an evidentiary hearing and denied relief. (Ex. F-13 - F-19.) Petitioner subsequently moved to disqualify the judge, and the motion was denied. (Ex. F-11 at 1965-72, 1997-98.) Petitioner filed an Emergency Writ of Prohibition in the Supreme Court of Florida. (Ex. G.) The court denied the writ without prejudice to Petitioner's right to raise the issue on appeal from the denial of his Rule 3.851 motion. (Ex. G-2.) The state trial court subsequently entered a Second Amended Order Denying Motion for Post-Conviction and Order on Defendant's Motion for Rehearing. (Ex. F-12 at 2017-92.) Petitioner appealed, and the Supreme Court of Florida affirmed. *Lynch v. State*, 2 So. 3d 47 (Fla. 2008); Ex. N.

Petitioner further filed a state petition for writ of habeas corpus in the Supreme Court of Florida, challenging the legality of his convictions. *Id.* The Supreme Court of Florida denied the petition. *Id.*

## III. GOVERNING LEGAL PRINCIPLES

Because Petitioner filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); *Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v.*

6

*Visciotti*, 537 U.S. 19, 24 (2002) (recognizing that the federal habeas court's evaluation of state-court rulings is highly deferential and that state-court decisions must be given the benefit of the doubt).

### A.    Standard of Review Under the AEDPA

Pursuant to the AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see Knowles v. Mirzayance*, 129 S.Ct. 1411, 1412 (2009); *Brown v. Payton*, 544 U.S. 133, 141 (2005). The phrase "clearly established Federal law," encompasses only the holdings of the Supreme Court of the United States "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Schwab v. Crosby*, 451 F.3d 1308, 1324 (11th Cir. 2006) (stating that the federal law relevant to this analysis is the Supreme Court of the United States precedent "in existence at the time the conviction became final").

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Sec'y for Dep't. of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005). The meaning of the clauses was discussed by the Eleventh

Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state
> court arrives at a conclusion opposite to that reached by [the United States
> Supreme Court] on a question of law or if the state court decides a case
> differently than [the United States Supreme Court] has on a set of materially
> indistinguishable facts.   Under the 'unreasonable application' clause, a
> federal habeas court may grant the writ if the state court identifies the correct
> governing legal principle from [the United States Supreme Court's] decisions
> but unreasonably applies that principle to the facts of the prisoner's case.

If the federal court concludes that the state court applied federal law incorrectly, habeas

relief is appropriate only if that application was "objectively unreasonable."  *Id.*

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the

state court's decision "was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding."  A determination of a factual issue

made by a state court, however, shall be presumed correct, and the habeas petitioner shall

have the burden of rebutting the presumption of correctness by clear and convincing

evidence.  *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

### B.      Standard for Ineffective Assistance of Counsel

The Supreme Court of the United States in *Strickland v. Washington*, 466 U.S. 668

(1984), established a two-part test for determining whether a convicted person is entitled

to relief on the ground that his counsel rendered ineffective assistance: (1) whether

counsel's performance was deficient and "fell below an objective standard of

reasonableness"; and (2) whether the deficient performance prejudiced the defense.[2]  *Id.* at

---

[2]In *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), the Supreme Court of the United
States clarified that the prejudice prong of the test does not focus solely on mere outcome

687-88.  The prejudice requirement of the *Strickland* inquiry is modified when the claim is a challenge to a guilty plea based on ineffective assistance.  *See Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985).  To satisfy the prejudice requirement in such claims, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  *Id.* at 59.

A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  *Strickland*, 466 U.S. at 689-90.  "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Id.* at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir. 1989).

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.  Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight.  *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy.  We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted).  Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the

---

determination; rather, to establish prejudice, a criminal defendant must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable.

ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

Additionally, it is well established that a defendant has the right to effective counsel on appeal. *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984). The Eleventh Circuit Court of Appeals has applied the Supreme Court's test for ineffective assistance at trial to guide its analysis of ineffective assistance of appellate counsel claims. *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991); *Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir. 1987). Thus, in order to establish ineffective assistance of appellate counsel, Petitioner must show (1) that counsel's performance was deficient and "fell below an objective standard of reasonableness" and (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687-88.

### C. *Exhaustion and Procedural Default*

One procedural requirement set forth in the AEDPA precludes federal courts, absent exceptional circumstances, from granting habeas relief unless the petitioner has exhausted all means of available relief under state law. 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-22 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971). Specifically, the AEDPA provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
>
> > (A)    the applicant has exhausted the remedies available in the courts of the State; or

(B)     (i)     there is an absence of available State corrective process; or

(ii)    circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

Thus, a federal court must dismiss those claims or portions of claims that have been denied on adequate and independent procedural grounds under state law. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), *holding modified by Martinez v. Ryan*, 132 S. Ct. 1309 (2012). In addition, a federal habeas court is precluded from considering claims that are not exhausted but would clearly be barred if returned to state court. *Id.* at 735 n.1 (stating that if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, there is a procedural default for federal habeas purposes regardless of the decision of the last state court to which the petitioner actually presented his claims).

In order to satisfy the exhaustion requirement, a state petitioner must "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard*, 404 U.S. at 275-76) (internal quotation marks omitted). The petitioner must apprise the state court of the federal constitutional issue, not just the underlying facts of the claim or a similar state law claim. *Snowden v. Singletary*, 135 F.3d 732 (11th Cir. 1998). The Supreme Court of the United States has observed that "Congress

11

surely meant that exhaustion be serious and meaningful." *Keeney v. Tamayo-Reyes*, 504 U.S.
1, 10 (1992).  Furthermore, the Court explained:

> [c]omity concerns dictate that the requirement of exhaustion is not satisfied
> by the mere statement of a federal claim in state court.  Just as the State must
> afford the petitioner a full and fair hearing on his federal claim, so must the
> petitioner afford the State a full and fair opportunity to address and resolve
> the claims on the merits.

*Id.*; *see also Henderson*, 353 F.3d at 898 n.25 ("Both the legal theory and the facts on which
the federal claim rests must be substantially the same for it to be the substantial equivalent
of the properly exhausted claim.").

Procedural default will be excused only in two narrow circumstances. First, a
petitioner may obtain federal review of a procedurally defaulted claim if he can show both
"cause" for the default and actual "prejudice" resulting from the default.  "To establish
'cause' for procedural default, a petitioner must demonstrate that some objective factor
external to the defense impeded the effort to raise the claim properly in the state court."
*Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999).  To establish "prejudice," a petitioner
must show that there is at least a reasonable probability that the result of the proceeding
would have been different.  *Henderson*, 353 F.3d at 892 (citations omitted).

The second exception, known as the "fundamental miscarriage of justice," only
occurs in an extraordinary case, in which a "constitutional violation has probably resulted
in the conviction of one who is actually innocent."  *Murray v. Carrier*, 477 U.S. 478, 496
(1986).  Actual innocence means factual innocence, not legal insufficiency. *Bousley v. United
States*, 523 U.S. 614, 623 (1998).  To meet this standard, a petitioner must "show that it is

12

more likely than not that no reasonable juror would have convicted him" of the underlying offense. *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  In addition, "'[t]o be credible,' a claim of actual innocence must be based on [new] reliable evidence not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S. at 324).

## IV.    MERITS OF THE PETITION

### A.    *Claim One*

Petitioner alleges that his trial attorneys, James Figgatt ("Figgatt") and Timothy Caudill ("Caudill"), rendered ineffective assistance prior to and during the penalty phase by failing to conduct a reasonable mitigation investigation and by failing to object to the inclusion of inadmissible evidence.  (Doc. No. 1 at 4.)  Petitioner argues that counsels' failures not only undermined confidence in the outcome of the penalty phase but also rendered his waiver of a penalty phase jury unknowing and involuntary.  (Doc. No. 1 at 4-5; Doc. No. 13 at 5.)  Petitioner contends that he suffered prejudice from counsels' deficient performance because, had he been fully apprised of the available mitigation evidence, he would not have waived a jury at his penalty phase.  (Doc. No. 13 at 33.)

In support of this claim, Petitioner argues that counsel: (1) failed to conduct a reasonable mitigation investigation of his background and mental health (sub-claim D); (2) failed to move to suppress the "murder-suicide" letter based on the doctrine of spousal privilege (subclaim B); (3) failed to move to suppress the "murder-suicide" letter pursuant to the Fourth Amendment (subclaim C); and (4) failed to consult a firearms expert in order

13

to present an "accidental shooting" defense to lesson the impact of aggravating factors (subclaim E).  As a result of each of these claims, Petitioner maintains that counsels' failures resulted in his unknowing and involuntary waiver of a penalty-phase jury (subclaim A). (Doc. No. 1 at 4-5.)

As discussed hereinafter, the Court grants habeas relief as to Petitioner's claim that counsel were ineffective for advising him to waive a penalty-phase jury prior to adequately investigating and advising him of his cognitive impairment.   The remainder of the subclaims are denied pursuant to Section 2254(d).

### 1.    *Mitigation Investigation (Subclaims A and D)*

#### a.    *Failure to Investigate Petitioner's Background*

Petitioner alleges that counsel were ineffective for failing to investigate and present background mitigation evidence.  (Doc. No. 1 at 5.)  Specifically, Petitioner asserts that counsel should have offered additional background mitigation at the penalty phase, such as testimony from Petitioner's friends and family, childhood photographs, a baptism certificate and photograph, commendations received while Petitioner worked as a sworn peace officer, and testimony regarding the circumstances of Petitioner's mother's death. (Doc. No. 1 at 6; Doc. No. 13 at 65.)   Petitioner further maintains that counsel were ineffective for failing to offer additional evidence to support the mental health mitigation, including the testimony of Petitioner's barber who described Petitioner as looking sick and disheveled shortly before the murders; evidence that Petitioner was delusional because years prior, he had bragged of an affair with an attractive co-worker; and evidence that

Morgan ended their relationship on the three-year anniversary of the death of Petitioner's mother. (Doc. No. 1 at 6-11.)

In considering the adequacy of the background information introduced at the penalty phase, the Supreme Court of Florida noted that Dr. Jacquelyn Olander, Petitioner's mental health expert, had provided penalty phase testimony that demonstrated a thorough understanding of Petitioner's background history and idiosyncracies. *Lynch*, 2 So. 3d at 47. In particular:

> During the penalty-phase proceedings, Dr. Jacquelyn Olander – a forensic neuropsychologist and Lynch's mental-health expert – provided comparable testimony that (1) Lynch's father was a security guard who was laid off due to a disability and became a stay-at-home father, (2) Lynch's father was a very strict disciplinarian and required Lynch to report to him every thirty minutes, (3) if Lynch was outside playing, his father required him to check in at excessively frequent intervals, (4) if Lynch's father was not home, he required Lynch to sign a sheet evidencing his check-ins, (5) neighborhood children teased Lynch concerning his check-ins with his father, (6) Lynch's father inflicted significant abuse, (7) Lynch's aunt, cousins, and next-door neighbor reported a lack of positive interaction between Lynch and his father, (8) the family described Lynch as a caring individual but "weird," "strange," and "rigid", (9) Lynch's cousin, Danelle Pepe, described one instance in which Lynch was reading a magazine upside-down, (10) Lynch washed his hands and automobile excessively, (11) Lynch had a very close relationship with his mother, (12) when Lynch's mother attempted to "run interference between" Lynch and his father, the father would physically abuse the mother in Lynch's presence, and (13) Lynch lived with his mother into his thirties, and even for a short time after his marriage to Virginia Lynch.

*Id.* The Supreme Court of Florida determined that Petitioner could not demonstrate deficient performance because counsels' decision to present Petitioner's background through a mental health expert was a strategic decision designed to synthesize the

information and avoid creating a disconnect between Petitioner's background or history and the events at issue. *Id.* at 72. The court further determined that even had counsel performed deficiently by not personally contacting some of Petitioner's witnesses, he could not demonstrate prejudice because Dr. Olander spoke with Petitioner's family before testifying at the penalty phase and the witnesses presented by Petitioner at the evidentiary hearing merely corroborated her testimony. *Id.*

The Supreme Court of Florida determined that the remainder of the lay-witness evidence was irrelevant, cumulative, disputed, or contradicted.[3] The court concluded that Danelle Pepe's ("Pepe") testimony concerning Petitioner's and his mother's habit of nail chewing and concerning Petitioner's actions at his mother's deathbed was irrelevant and remote in time to the events of March 5, 1999; the testimony of Petitioner's barber that Petitioner seemed sick when he visited his barbershop during early March 1999 was cumulative to Dr. Olander's testimony during the penalty phase that Petitioner was decompensating at the time of the offenses; Edward Corso's ("Corso") testimony that Petitioner's father was a racial bigot and that Petitioner grew up in a safe neighborhood

---

[3]Petitioner argues that the Supreme Court of Florida impermissibly discounted this evidence in violation of *Lockett v. Ohio*, 438 U.S. 586 (1978) and *Hitchcock v. Dugger*, 481 U.S. 393 (1987). These cases are inapposite to the facts at hand. First, the cases do not address the weight a reviewing court must give mitigating evidence introduced at a post-conviction hearing. Next, while a sentencer must be allowed to consider and give effect to the evidence offered in mitigation, these Supreme Court decisions do not dictate the effect that must be given once the evidence is considered – they do not require a sentencer to conclude that a particular fact is mitigating or to give it any particular weight. *Puiatti v. McNeil*, 626 F.3d 1283, 1314 at n.28 (11th Cir. 2010) (citing *Schwab v. Crosby*, 451 F.3d 1308, 1329 (11th Cir. 2006)).

was irrelevant and cumulative; and Vesna Lovsin's ("Lovsin") testimony that she had never had sex with Petitioner, offered to support Petitioner's claim that he suffers from delusions, was disputed, irrelevant and cumulative. *Lynch*, 2 So. 3d at 47.

The Supreme Court of Florida further determined that the documentary evidence submitted during the post-conviction proceedings either corroborated information reported by Petitioner during the penalty phase or was irrelevant.  Accordingly, Petitioner's credit card receipts and statements were unnecessary because the trial court was aware of how Petitioner's credit card debt related to the crimes; Petitioner's citizen's arrest commendations, received in the early 1980's, were remote in time to the offenses involved in the case; Petitioner's employment records were cumulative because the court was already aware of Petitioner's employment history; and the court knew that Petitioner was Catholic, so his confirmation photograph was partially cumulative. *Lynch*, 2 So. 3d 47 at 73.

In reviewing this claim, this Court has considered the testimony of Petitioner's family and friends presented at the post-conviction hearing and the documentary evidence that Petitioner alleges should have been introduced.  Petitioner's cousin-in-law, Corso, testified that Petitioner was an awkward but polite and well-dressed child who was obsessed with guns and aspired to become a policeman.  He said that Petitioner's father had been overly protective and a racial bigot but that his mother was very nice.  (Ex. F-15 at 443-76.)  Petitioner's cousin, Pepe testified that she had been contacted by Petitioner's defense attorney and by his psychologist prior to the penalty phase but had spoken to both

17

of them briefly. She indicated that Petitioner was a quirky kid who chewed his nails but that he could be relied upon to take his cousins out for snacks. She identified family photographs and testified that Petitioner had once brought a beautiful Russian woman to a family dinner. She said that Petitioner had acted strangely immediately after his mother died by putting into his pocket a tissue that he had used to blot blood off his mother's hand. *Id.* at 477-508. Petitioner's former co-worker, Lovsin testified that she did not remember Petitioner and denied having a sexual affair with him but said that it was possible that she attended a holiday dinner with him. *Id.* at 510-18, 531. George Kabbez testified that Petitioner often parked his vehicle at the gas station owned by Kabbez's father. He described Petitioner as a peculiar person who was obsessed with guns. Although he had no specific recollection of whether Petitioner spoke of his involvement with Lovsin, he said that Petitioner would talk about having sex with women. Kabbez believed that Petitioner was in the army or marines. *Id.* at 518-31. Joseph Joyce, Petitioner's landlord in New York, testified that Petitioner was peculiar and that he never saw him with anyone other than his mother. *Id* at 532-37. Clinton Cody, Petitioner's friend and barber, testified that Petitioner had confided in him about marital problems and that several days before the murder, he looked as if he had been sick. *Id.* at 538-46.

Both Figgatt and Caudill testified that they had made a strategic decision to present Petitioner's background through the testimony of Petitioner's mental health expert instead of through live witnesses based upon their knowledge of the trial court's ("Judge Eaton's") preferences. (Ex. F-14 at 278; Ex. F-18 at 1104.) Caudill explained that a mental health

18

expert could best synthesize information gathered from background witnesses and link up information to a defendant's actions at the time of the crime.  (Ex. F-18 at 1104-05.)

Post-conviction counsel quizzed Figgatt as to whether he should have introduced (1) copies of Petitioner's birth records, indicating that he had been hospitalized for eight days after his birth, and his marriage certificate; (2) a letter from Lynch's mother referencing Petitioner's marital problems; (3) his mother's death certificate indicating that she had died on the same date, years prior to, the date Morgan ended the relationship with Petitioner; (4) a photograph of Petitioner's confirmation and a confirmation card from his parents; (5) certificates regarding Petitioner's photography hobby; (6) a Valentine's Day card written to Morgan after she ended her relationship with Petitioner; (7) a Christmas card from Petitioner to Leah Caday; (8) motel receipts; (9) parking receipts; (10) credit card receipts; (11) a commendation for making a citizen's arrest; (12) employment records; and (13) school records.  (Ex. F-13 at 150-200.)  Figgatt conceded that he should have done more to humanize Petitioner  (Ex. F-13 at 150.)

Despite Figgatt's concession, Petitioner has not overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.  It was not unreasonable, based upon counsels' knowledge of Judge Eaton, to present mitigating evidence of Petitioner's background through the testimony of their expert witness.  *Webb v. Mitchell*, 586 F.3d 383 (6th Cir. 2009) (counsel's performance not deficient even though habeas counsel raised legitimate critiques of trial counsel's performance and presented a more "nuanced and troubling picture" of

defendant's mental health than trial expert did because the habeas expert "merely develop[ed] a different psychological profile based on the same facts" trial expert used). Moreover, after reviewing the background and documentary evidence that Petitioner contends should have been presented at trial, this Court agrees with the Supreme Court of Florida that the omitted evidence was either irrelevant or cumulative to the evidence actually presented at the penalty phase. The background information about which the additional witnesses would have testified and the information contained within the additional documentary evidence was presented to the sentencing court, albeit in a different and less detailed manner. *See Bobby v. Van Hook*, 130 S. Ct. 13, 19 (2009) (no prejudice if additional background mitigation evidence adds nothing of value). Therefore, Petitioner has demonstrated neither deficient performance nor prejudice from counsels' failure to present additional background evidence at his penalty phase.

        b.      *Failure to Properly Investigate and Pursue Diagnosis of a Cognitive Impairment*

Petitioner asserts that counsel were ineffective for failing to alert mental health expert witness, Dr. Olander, to the fact that another mental health expert suspected that Petitioner had brain damage and had recommended further neuropsychological testing to determine the degree of Petitioner's impairment.

In considering this claim, the Supreme Court of Florida determined that the mental health mitigation presented during Petitioner's post-conviction hearing was "the only truly new mitigation evidence" presented. *Lynch*, 2 So. 3d at 73. The court recognized that prior

to the penalty phase, Dr. David Cox, Petitioner's first mental health expert, had concluded that Petitioner suffered from a cognitive disorder NOS (not otherwise specified) and a possible paranoid personality disorder and had recommended neuropsychological testing to determine the degree of Petitioner's impairment. Trial counsel, displeased with the style of Dr. Cox's report, retained neuropsychologist Dr. Olander. Counsel, however, did not provide Dr. Olander with a copy of Dr. Cox's report or inform her of Dr. Cox's diagnoses. Trial counsel also did not obtain Petitioner's school records or other background information that could have corroborated cognitive impairment. Dr. Olander assumed that Dr. Cox had ruled out a cognitive impairment and conducted no neuropsychological testing. She conducted only psychological testing and diagnosed Petitioner with schizoaffective disorder. She testified at trial that Petitioner did not have any brain impairment. *Lynch*, 2 So. 3d 47 at 74. The Supreme Court of Florida held:

> Based on the fact that trial counsel knew Lynch suffered from some type of cognitive impairment and never fully investigated this condition, counsel were deficient during the penalty phase in failing to address and utilize evidence related to Lynch's frontal-lobe and right-hemispheric cognitive impairment.

*Id*. at 75. Although the Supreme Court of Florida determined that trial counsel was deficient, it concluded that this failure did not prejudice Petitioner. *Id*. at 71-77.

In addressing the prejudice inquiry, the Supreme Court of Florida stated that "[p]rejudice, in the context of penalty phase errors, is shown where, absent the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different or the deficiencies substantially impair confidence in the

21

outcome of the proceedings." *Id.* at 70 (citing *Gaskin v. State*, 737 So. 2d 509, 516 n. 14 (Fla. 1999)).   The Supreme Court of Florida considered the testimony of five mental health experts retained by Petitioner and two mental health experts retained by the State.   The court noted that, while each expert agreed that Petitioner suffered from a mild cognitive impairment, there was disagreement as to whether the impairment qualified Petitioner for Florida's statutory mental health mitigators.  *Id.* at 75.

The Supreme Court of Florida discounted State mental health expert Dr. William Reibsame's testimony because some of his psychological testing of Petitioner was invalidated by the non-standard manner in which the tests had been administered.  *Id.*  The court determined, however, that State expert Dr. Jeffrey Danziger's testimony was the most persuasive of the mental health experts:

> Dr. Danziger's explanation of Lynch's mindset on the date of the murders is the most persuasive of those offered during the postconviction proceedings:
>
>> [Lynch] is someone who did not act in an impulsive fashion. . . .  What we have here is two days before [the offenses,] the letter shows a murder/suicide plot.  Earlier that day, according to his wife, he acted perfectly normal, he took care of his children, he dropped his son off.  Nothing in his behavior suggested disorganization, psychotic thinking, agitation, a perfectly unremarkable morning in the life of Mr. Lynch taking care of his children and waiting for his wife to come home. . . . He then takes three guns in a bag, all of them loaded, drives over to the apartment complex, puts his car somewhere [Roseanna Morgan] can't see it as she's coming in[to] her apartment.  What does this suggest?  Planning, forethought, organization, not impulsive action, not a, I caught you in bed with somebody so I strangled you in the heat of the moment or without thinking.  This is something planned and organized. He then waits, sees [Leah Caday], essentially follows her up the

> stairs and somehow either forces or cajoles his way in, holds her
> hostage, waiting however long, thirty, forty minutes, all of
> which at any time he could have changed his mind.  This was
> not something that happened instantly but went on over this
> extended period of time.  Of course then Roseanna appears at
> the door, shots are fired, he drags her in, administers the coup
> de grace, and then Leah gets hit.  He then changes his mind on
> the suicide plan and then decides that he wishes to live.  As I
> put all of this together, we have a man with no significant prior
> psychiatric history, no evidence of psychosis, no evidence of
> dementia, functioning perfectly unremarkably in his life.

> Thus, Lynch displayed organized, methodical planning in his perpetration
> of these offenses.  Further, he displayed critical impulse control in electing
> not to inflict self-harm.  During and after the offenses, Lynch explained his
> actions in a detailed, specific fashion.

*Id.*  The Supreme Court of Florida further noted that Petitioner was completely sober at the

time of the murders and "a mass of evidence demonstrates that he methodically planned

the murder-suicide plot."  *Id.* at 76.   The court also expressly discounted Petitioner's

demonic-presence argument, which he had raised as demonstrative of emotional

disturbance and hallucination.  Relying on Dr. Danziger's testimony, the Supreme Court

of Florida noted that Petitioner's feeling of an evil presence after the murder was "wholly

consistent with a realization that he had committed terrible acts."  *Id.* at 77.  Finally, the

court determined that Petitioner had failed to link any cognitive condition with his

behavior on the day of the murders:

> Lynch has simply failed to present any evidence connecting any cognitive
> condition to his behavior.  Even if we fully accepted the testimony of his
> post-conviction mental-health experts, there has been little to no testimony
> establishing that any impairment or schizoaffective symptoms contributed
> to his actions on March 5, 1999.  Lynch had no prior history of criminal
> activity but by all defense accounts has always had this condition.

> Furthermore, he thoroughly planned and carried out his memorialized intent to murder Roseanna Morgan and then demonstrated critical impulse control by refusing to commit suicide.

*Id.* at 77.

In reviewing this claim, the Court considers the evidence presented at Petitioner's penalty phase as well as the mitigation evidence presented at the post-conviction hearing.

### i.        *Penalty Phase Mental Health Evidence*

Dr. Olander testified about Petitioner's background, including his life in New Jersey and New York, and diagnosed him with a personality disorder with obsessive compulsive and paranoid features and a schizoaffective disorder with a formal thought disorder that impacted his ability to think and behave in a rational, logical manner.   She opined that Petitioner was under the influence of an extreme mental or emotional disturbance and his ability to conform his conduct with the requirements of law was substantially impaired at the time of the murders.   When asked whether Petitioner suffers from brain damage, the following exchange occurred:

| | |
|---|---|
| [STATE]: | Now, you said that you administered some tests to Mr. Lynch, correct? |
| [DR. OLANDER]: | Correct. |
| [STATE]: | And he performed those tests, correct? |
| [DR. OLANDER]: | Correct. |
| [STATE]: | And based upon the findings of those tests, Mr. Lynch is not suffering from any organic brain damage, correct? |
| [DR. OLANDER]: | No, I did not diagnose him with an [sic] organic brain |

damage.

(Ex. A-8 at 829.)

Dr. Riebsame, the State's mental health expert, diagnosed Petitioner with a major depressive disorder and a personality disorder. Dr. Riebsame, however, testified that his testing and the evidence of Petitioner's affectation at the time near the murders had not revealed a schizoaffective disorder. He believed that Petitioner was suffering emotional distress but not extreme distress at the time of the shootings. He opined that Petitioner's ability to conform his conduct to the law at the time of the murders was not substantially impaired. (Ex. A-6 - Ex. A-8.)

In the sentencing order, Judge Eaton found three aggravating factors applied to Roseanna Morgan's murder: (1) the murder was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification ("CCP") (great weight); (2) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person (moderate weight); and (3) the capital felony was committed while the defendant was engaged in aggravated child abuse, burglary or kidnapping (little weight). (Ex A-3 at 502-11.)

Judge Eaton found three aggravating factors applied to Leah Caday's murder: (1) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person (great weight); (2) the murder was committed while the defendant was engaged in aggravated child abuse, burglary or kidnapping (moderate weight); (3) the murder was especially heinous, atrocious, or cruel ("HAC")

25

(great weight).  *Id*. at 511-14.

As mitigating circumstances, Judge Eaton found the following non-statutory mitigators: (1) the crime was committed while the defendant was under the influence of mental or emotional disturbance but not extreme emotional disturbance; (2) the defendant's capacity to conform his conduct to the requirements of law was impaired but not substantially impaired; (3) the defendant had no significant history of prior criminal activity; (4) the defendant suffered from mental illnesses at the time of the offense; (5) the defendant was emotionally and physically abused as a child; (6) the defendant had a history of alcohol abuse; (7) the defendant has adjusted well to incarceration; (8) the defendant cooperated with the police; and (9) the defendant expressed remorse, was a good father to his children, and intended to maintain a relationship with his children while in prison.  *Id*. at 514-20.  The court gave only moderate weight to the first mitigating circumstance because he believed the extent of Petitioner's emotional disturbance to be less than extreme.  *Id*. at 515.  The court also gave only moderate weight to the second factor because he believed that Petitioner's capacity to conform his conduct to the requirements of the law was impaired but not substantially impaired.  *Id*. at 515.  The court gave little weight to the fourth factor, determining that the evidence had established a personality disorder with paranoid features, obsessive-compulsive features, and passive aggressive features.  The court, however, rejected Dr. Olander's diagnosis of schizoaffective disorder. *Id*. at 516.  Because there was no connection between Petitioner's alleged childhood emotional and physical abuse or his alcohol abuse and the murders, factors five and six

were given little weight.  *Id.*

ii.     *Post-Conviction Evidence*

At the post-conviction hearing, Figgatt testified that he had initially hired Dr. Cox as Petitioner's mental health expert.  (Ex. F-14 at 224.)   Figgatt indicated that he had been displeased with Dr. Cox's report because it did not provide a nexus between Petitioner's mental illness and the murders.  *Id*. at 225-28.  Figgatt felt that Dr. Cox's report was so nebulous that he "[couldn't] buy an MRI or anything like that based upon this kind of recommendation from Dr. Cox.  So [he] went to Dr. Olander."  *Id*. at 234.  He did not provide Dr. Olander with Dr. Cox's written report because he did not want her to be influenced by his conclusions.  Figgatt, however, asked Dr. Olander "to do everything that she could come up with that had anything to do with what caused [Petitioner] to do what he did that day." *Id*. at 232-35.

Similarly, Caudill testified that one of the reasons Dr. Olander was hired was to follow up on Dr. Cox's suggestion that further neuropsychological testing be done.  (Ex. F-18 at 1116-18.)  Because Dr. Olander was a neuropsychologist, both Figgatt and Caudill expected her to perform neuropsychological testing.  (Ex. F-14 at 233-235; Ex. F-18 at 1135.) However, Caudill admitted that the report received from Dr. Olander indicated that only psychological testing, not neuropsychological testing, had been performed.  (Ex. F-18 at 1135-36.)

Seven mental health experts testified.  Psychologist Dr. Cox, neuropsychologist Dr. Olander, neurologist David McCraney, neurologist Joseph Sesta, and psychiatrist Joseph

Chong-Sang Wu testified on Petitioner's behalf.  Dr. Olander indicated that, when she testified at the penalty phase, she believed that brain damage had been excluded by Dr. Cox.  When questioned why she had testified that Petitioner had no brain damage based upon the findings of her testing, she replied that "in retrospect, a better answer would have been that I did not evaluate or assess for brain damage." (Ex. F-16 at 647.)  After reviewing Dr. Cox's initial report, she believed that his testing indicated brain damage, and she would have performed more tests if she had known of Dr. Cox's diagnoses.  *Id.* at 646-56.   She testified that Petitioner's organic brain damage would have had a significant impact on Petitioner's self control and would have added weight to the emotional state Petitioner was experiencing at the time of the murders.  *Id.* at 672-73.  However, Dr. Olander stood by her original diagnosis of schizoaffective disorder.  *Id.* at 695.

Dr. Cox testified that Petitioner had a dysfunction of thinking skills, "quite likely due to a brain damage situation."  (Ex. F-16 at 611.)  He testified that the statutory mental health mitigators may have applied in this case.  *Id.* at 615.

Dr. McCraney testified that Petitioner had frontal lobe and right hemisphere brain damage and suffered from psychosis.  (Ex. F-16 at 737, 741.)  He determined that Petitioner's ability to control his behavior was impaired but did not opine as to whether Petitioner met the criteria for extreme emotional disturbance. *Id.* at 741, 762. Dr. McCraney noted that, while Petitioner had likely suffered from a brain dysfunction his entire life, people who suffered from his condition had an impaired ability "to inhibit violent responses." *Id.* at 741. He further testified that stressors such as the anniversary date of the

28

death of his mother, spiraling credit card debt, a failing marriage, and the loss of ability to be with his children could have compromised Petitioner's ability to compensate for his cognitive impairment. *Id.* at 742-744. Dr. McCraney said that Petitioner's brain impairment, combined with the stress he was under, more likely than not contributed to the offenses. *Id.* at 760. He described Petitioner as "a walking time bomb." *Id.* at 768.

Dr. Wu examined Petitioner's PET scan and concluded that his brain showed an abnormality in the distribution of activity in the frontal lobe of the brain relative to the back of the brain. (Ex. F-17 at 879.) Dr. Sesta also testified that Petitioner suffered from mild brain impairment and possible psychosis but not traumatic brain damage. (Ex. F-17 at 965, 986, 992.) He opined that people with Petitioner's condition, "do quite well" when given a routine, but decompensate rapidly and severely when under great stress. *Id.* at 987-88. He testified that the impairment would make Petitioner less able than a normal person to conform his behavior to the standards of the law although Petitioner knew what he was doing and that it was wrong. *Id.* at 982-98. Dr. Sesta opined that Petitioner's ability to conform his conduct to the law was substantially impaired. He, however, did not have an opinion as to whether Petitioner suffered from extreme emotional disturbance at the time of the murders, other than that he was suicidal. (Ex. F-18 at 1015; Ex F-17 at 993.)

Psychologist William Riebsame and psychiatrist Jeffrey Danziger testified for the State. Dr. Riebsame agreed that Dr. Cox's testing was supportive of mild cognitive impairment that likely reflected a learning disorder which in turn affected school performance. (Ex. F-18 at 1039, 1182.) He testified that Petitioner had admitted that he

knew what he was doing was wrong and that Petitioner's ability to conform his conduct to the law was not substantially impaired.  *Id.* at 1040, 1151.  However, Dr. Reibsame admitted that he had incorrectly administered some of the tests used to evaluate Petitioner prior to the penalty phase.  *Id.* at 1079-81, 1158, 1167.

Dr. Danziger opined that Petitioner was not suffering from any psychotic illness and did not have schizoaffective disorder. (Ex. F-19 at 1213.)  Based on the amount of planning prior to the murders, Dr. Danziger did not believe that Petitioner acted impulsively.  *Id.* at 1214.  He testified that Petitioner was under some distress at the time of the murders but not to the point of being unable to control his behavior.  *Id.* at 1216.  He stated that, even if Petitioner had a mild cognitive impairment, such an impairment would not have affected his behavior at the time of the murders.  *Id.* at 1218.  Dr. Danziger did not believe that Petitioner's ability to conform his conduct to the law was substantially impaired at the time of the murders.  *Id.* at 1219.

### iii.    *Deficient Performance*

The Supreme Court of Florida determined that counsel were deficient for failing to ensure that Petitioner was tested for organic brain damage and to utilize evidence of Petitioner's cognitive impairment at trial. *Lynch*, 2 So. 3d at 75.  Under *Strickland*, deficient performance is shown if counsel's actions are "outside the wide range of professionally competent assistance." 466 U.S. at 691-92.

Given that Dr. Cox's initial report indicated the probable existence of cognitive impairment and Dr. Olander's report indicated that only psychological testing had been

performed, counsel should have ensured that Dr. Olander administered tests which assessed whether brain damage existed.  The parties do not dispute that counsel performed deficiently by failing to investigate and present evidence of cognitive impairment.  This Court, therefore, must determine whether the state court unreasonably applied *Strickland* in holding that Petitioner was not prejudiced by the deficiency.  *Porter v. McCollum*, 130 S. Ct. 447 (2009).

iv.     Prejudice

"When a [petitioner] challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently re-weighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Strickland*, 466 U.S. at 695.   To determine if prejudice resulted from counsel's unreasonable failure to investigate and present favorable or mitigating evidence, federal courts "reweigh the evidence in aggravation against the totality of available mitigating evidence."  *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).  The critical issue is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  This analysis requires the Court to evaluate the totality of the available mitigation evidence – both that presented at trial and at the collateral proceedings.  *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000).  If "the available mitigating

evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [the defendant's] moral culpability," then prejudice has been shown. *Wiggins*, 539 U.S. at 538.

In the instant case, significant evidence was presented at the penalty phase through the testimony of Dr. Olander regarding Petitioner's mental health, but the court was told that Petitioner did not suffer from brain damage. Petitioner's sentencing court considered Dr. Olander's testimony and determined that the statutory mental health mitigating factors did not apply. The court, however, found that three non-statutory mental health mitigating factors did apply. At the post-conviction evidentiary hearing, every defense expert and Dr. Riebsame agreed that Petitioner suffered from some degree of cognitive impairment. Dr. Danziger did not offer an opinion as to whether Petitioner suffered from brain impairment, noting that even if he suffered "some mild cognitive impairment," it was irrelevant to the murder. (Ex. F-19 at 1218, 1266.) Accordingly, that Petitioner suffers from brain dysfunction is not disputed by either side.

The Supreme Court of Florida considered the testimony of each witness presented at the post-conviction hearing and determined that the state's post-conviction expert, Dr. Danziger, was the most persuasive of the mental health experts. *Lynch*, 2 So. 3d at 75. The Supreme Court of Florida further determined that Petitioner had failed to connect his cognitive condition to his behavior at the time of the crimes. *Id.* at 77. In so ruling, the Supreme Court of Florida did not address testimony from Petitioner's mental health experts that linked his mental condition to his actions on the day of the murders. Instead, the state court determined that Petitioner "simply failed to present any evidence

32

connecting any cognitive condition to his behavior."   The court further concluded that Petitioner had presented "little or no testimony establishing that any impairment or schizoaffective symptoms contributed to his actions on March 5, 1999."  *Lynch*, 2 So. 3d at 77.  The state court noted that, even though Petitioner had always suffered from a brain condition, he had no prior criminal history, had thoroughly planned and executed the murders, and had demonstrated impulse control by not committing suicide.  *Id.*

A state court's factual  findings are presumptively correct unless shown to be factually wrong by clear and convincing evidence.  *See Gore v. Sec'y for Dep't. of Corr.*, 492 F.3d 1273, 1294 (11th Cir. 2007); *Jones v. Walker*, 540 F.3d 1277, 1288 (11th Cir. 2008).  When a state court's "adjudication of a habeas claim results in a decision that is based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, this Court is not bound to defer to the legal conclusions that flow from them." *Jones*, 540 F. 3d. at 1288.   Moreover, when a state court unreasonably determines the facts relevant to a claim, AEDPA deference is not owed to the state court's findings, and the federal court will apply a *de novo* standard of review.  *Cooper v. Sec'y, Dep't. of Corr.*, 646 F.3d 1328, 1353 (11th Cir. 2001); *Green v. Nelson*, 595 F.3d 1245, 1251 (11th Cir. 2010) (finding that state court unreasonably determined the facts under § 2254(d)(2) and applying *de novo* review).

This Court concludes that the Supreme Court of Florida's determination that Petitioner "simply failed to present any evidence connecting any cognitive condition to his behavior" is an unreasonable determination of the facts.   At the post-conviction

proceeding, Petitioner presented testimony from three mental health experts that linked his impairment to his actions on the day of the murders. Dr. Olander testified that Petitioner's organic brain damage would have had a significant effect on his self control, labeling the interaction of Petitioner's psychotic thought processes and frontal lobe damage as "incredibly disabling." (Ex. F-16 at 657.) Both Dr. McCraney and Dr. Sesta testified that Petitioner's condition, combined with emotional and situational stress, could have led to Petitioner's decompensation and an impaired ability to control his violent behavior. Dr. McCraney testified that Petitioner's brain impairment, combined with the stress he was experiencing, more likely than not contributed to the offenses. (Ex. F-16 at 760.)[4] Dr. Sesta described the combination of stress with a brain impairment and psychosis as a "disaster."

---

[4] Dr. McCraney, who did not discuss the facts of the murder with Petitioner, was asked on direct examination about the hypothetical combination of stress and brain damage. Dr. McCraney noted that brain damaged people tend to be non-violent in non-stressful situations:

> So, by extension, I suppose, if a person with a relatively mild degree of brain impairment is subjected to an extraordinary stress, all right, I would consider stress sufficient to make a person suicidal to be extraordinary by definition. If it takes away his ability to live, that's a lot of stress.
>
> So, that basically throws gasoline on the fire. So given the assumptions you asked me to make, that he's under an extraordinary amount of stress, that he's . . . that he's suicidal, and taking into account what I know, that he has a brain dysfunction that interferes with his ability to control his behavior, sounds to me like you're describing the perfect storm. You're describing an unbelievable amount of stress affecting a person who has a tendency to be psychotic to begin with, and he lacks full control of his behavior. That's a bad situation waiting to happen.

(Ex. F-16 at 742.)

(Ex. F-17 at 987.)  Thus, evidence was presented at the post-conviction hearing linking Petitioner's cognitive impairment to his actions.  Accordingly, because the state court's decision was based upon an unreasonable determination of the facts, this Court must independently determine whether the failure of Petitioner's counsel to investigate and present additional mental health evidence at the sentencing proceeding resulted in prejudice.  *See* 28 U.S.C. § 2254(d)(2); *Sochor v. Sec'y, Dep't. of Corr.*, 685 F. 3d 1016, 1030 (11th Cir. 2012).

Testimony regarding Petitioner's brain damage would have been compelling mitigating evidence and is the type of evidence that the Supreme Court has recognized as relevant in assessing a defendant's moral culpability.  *See Porter*, 130 S. Ct. at 454 (concluding that prejudice resulted when counsel failed to present evidence of the defendant's brain abnormality); *Sears v. Upton*, 130 S. Ct. 3259, 3267 (2010) (prejudice found when evidence of Sears' significant mental and psychological impairments was not introduced during the penalty phase).[5] The brain damage described by Petitioner's mental

---

[5]The Court recognizes that *Porter* and its progeny focus on the effect that mitigating evidence would have had *on the sentencing body*.  *Porter*, 130 S. Ct. at 454-55 ("While the State's experts identified perceived problems with the tests [used by the defense expert] and the conclusions that he drew from them, it was not reasonable to discount entirely the effect that this testimony might have had on the jury or a sentencing judge."); *see also Sears*, 130 S. Ct. 3259 (prejudice shown because petitioner's "significant frontal lobe abnormalities" and other mental health and background information could have helped a jury understand petitioner and his acts).  In the instant case, Petitioner did not have a sentencing jury.  Petitioner waived a jury and was sentenced by the same judge who heard the post-conviction evidence.  Accordingly, the Supreme Court of Florida was aware of the result that the post-conviction evidence had on Petitioner's actual sentencing body. However, *Porter* also stands for the proposition that a state court errs when it fails to consider or "unreasonably discounts" evidence adduced in a post-conviction hearing.  *Id.*

health experts at the evidentiary hearing could have resulted in greater mitigating weight being given to the mental health mitigation than was given to Dr. Olander's original diagnosis of schizoaffective disorder.  The evidence could have supported the application of the statutory mental health mitigators that, at the time of the murders, Petitioner was "under the influence of extreme mental or emotional disturbance" and his capacity to "appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of law was substantially impaired," Fla. Stat. §§ 921.141(6)(b), (f).  The additional mental health evidence also could have added weight to the non-statutory mental health mitigation.  The trial court gave little to moderate weight to each of the three mental health mitigating factors.

In addition to strengthening the mitigating factors, expert evidence demonstrating that Petitioner suffered from brain damage could have had the effect of weakening the aggravating factors.  *Hardwick v. Crosby*, 320 F.3d 1127, 1164 (11th Cir. 2003) ("[P]sychiatric mitigating evidence not only can act in mitigation, it could also significantly weaken the aggravating factors."); *Middletown v. Dugger*, 849 F.2d 491, 495 (11th Cir. 1988) (psychiatric evidence has the potential to change the evidentiary picture by altering the causal relationship that can exist between mental illness and homicidal behavior).  Petitioner's mental health experts maintained that damage to the frontal lobe of the brain would have significantly impacted Petitioner's self-control, including his ability to inhibit violent responses, particularly when under stress.  Evidence was presented regarding the stress Petitioner was under as a result of financial concerns and the potential end of his marriage.

Thus, the testimony of Petitioner's mental health experts could have served to reduce the calculated nature of the crime and lessened the weight of the CCP aggravator.

Nevertheless, this was not a case in which little or no mental health mitigation was presented at the penalty phase. Dr. Olander testified that Petitioner suffered from schizoaffective disorder with a formal thought disorder that had an impact on his ability to behave in a rational and logical manner. She also testified that both statutory mental health mitigators applied. Although new evidence was presented at the post-conviction hearing that Petitioner suffers from a cognitive impairment, Dr. Olander's original diagnosis of schizoaffective disorder did not change. In addition, at the post-conviction hearing, Dr. Danziger rejected Dr. Olander's diagnosis of schizoaffective disorder, observing that Petitioner had not acted impulsively and that his behavior did not suggest disorganization or agitation. He testified that Petitioner's cognitive impairment was not relevant to his actions on the day of the murders, noting that "this was not something that happened instantly, but went on over this extended period of time." Dr. Danziger opined that Petitioner had methodically planned the murder of Morgan and was a man "with no significant prior psychiatric history, no evidence of psychosis, no evidence of dementia, functioning perfectly unremarkably in his life." *Lynch*, 2 So. 3d at 76. Balancing the testimony of the mental health experts, therefore, the Court determines that great weight should have been given to the three non-statutory mental health mitigators found by the trial court.

Analysis of the prejudice prong, however, requires consideration of the aggravating

circumstances associated with Petitioner's case to determine whether "without the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different." *Strickland*, 466 U.S. at 687.  This is not a case "where the weight of the aggravating circumstances or the evidence supporting them was weak." *Sochor*, 685 F. 3d at 1030 (quoting *Suggs v. McNeil*, 609 F. 3d 1218, 1232 (11th Cir. 2010)).  Three aggravating circumstances were found for each victim.  Although Petitioner had no significant prior criminal record, more than one victim was involved, supporting the statutory aggravating factor that the "defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person" for both murders.  Fla. Stat. § 921.141(5)(b).  Petitioner also confined Caday by gunpoint and held her as hostage in her apartment for thirty to forty minutes while waiting for her mother to arrive.  Caday was terrified during this time, and she subsequently witnessed the brutal murder of her mother and was then shot and killed.  The evidence, therefore, supports a finding that the murder of Caday was committed while Petitioner was engaged in burglary or kidnapping and her murder was "especially heinous, atrocious, or cruel."  Fla. Stat. §§ 921.141 (5)(h), (d); *Henyard v. State*, 689 So. 2d 239, 253 (Fla. 1996) ("Under Florida law, the heinous, atrocious, or cruel aggravating circumstance may be proven in part by evidence of the infliction of 'mental anguish' which the victim suffered prior to the fatal shot."). Likewise, ample evidence was presented that the murder of Morgan was carefully planned, supporting the CCP aggravating factor.  Fla. Stat. § 921.141(5)(I); *Dennis v. State*, 817 So. 2d 741, 765 (Fla. 2002) (upholding CCP where facts showed defendant arrived at the

apartment before the victim and waited for her arrival).  Although the weight given to the CCP aggravator may have been lessened by Petitioner's cognitive impairment, the Court determines that this is not probable given the substantial evidence supporting the CCP aggravator coupled with the differing opinions of the defense experts concerning Petitioner's ability to control his violent behavior.

"Many death penalty cases involve murders that are carefully planned, or accompanied by torture, rape or kidnaping." *Jackson v. Herring*, 42 F. 3d 1350, 1369 (11th Cir. 1995).  In these types of cases, the Eleventh Circuit has found that the aggravating circumstances outweigh any prejudice caused by the omission of relevant mitigating evidence.  *See, e.g.*, *Sochor*, 685 F. 3d at 1031 (despite evidence of a psychological disorder, "[t]he deficient performance of Sochor's counsel did not prejudice him" in case involving rape and murder by a defendant who had been previously convicted of a vicious sexual assault); *Francis v. Dugger*, 908 F.2d 696, 703-04 (11th Cir. 1990) (finding that "evidence of a deprived and abusive childhood [was] entitled to little, if any, mitigating weight," in a case concerning a deliberately planned torture murder).  The aggravating circumstances of the instant case involved organized, careful planning and kidnapping.  In light of the weighty aggravators and the disagreement among the experts regarding whether Petitioner's cognitive impairment contributed to his actions on the date of the offenses, the Court cannot conclude that the mitigating factors outweigh the aggravating factors.

In sum, when considering the totality of the available mitigation adduced at trial and in the post-conviction hearing and re-weighing it against the significant evidence in

aggravation, Petitioner has not established that a reasonable probability exists that he was prejudiced by counsels' failure to present expert neuropsychological evidence of brain damage at sentencing. This is not a case in which the sentencer heard very little mitigating evidence or where the case in aggravation was weak. *See Rutherford v. Crosby*, 385 F.3d 1300, 1315, 1315–16 (11th Cir. 2011) (holding state court's conclusion of no prejudice reasonable because, *inter alia*, the jury heard at the penalty phase some evidence of defendant's mental and emotional state and other possible non-statutory mitigating factors and strong aggravating factors existed); *cf. Williams*, 529 U.S. at 395-98 (the petitioner suffered prejudice because only one aggravating factor was established and counsel failed to introduce "the comparatively voluminous amount of evidence" in his client's favor, including evidence of a "nightmarish childhood," offering instead only a "sole argument in mitigation"). On *de novo* review, this claim fails because Petitioner has not demonstrated prejudice. *See Jefferson v. Fountain*, 382 F. 3d 1286, 1295 n.5 (11th Cir. 2004) ("[I]f a state habeas court denies relief where we would have done so if we were conducting *de novo* review, federal relief is due to be denied regardless of the reasoning the state court used to reach that result.").

### 2.     Penalty Phase Waiver of Jury (Subclaim A)

Petitioner contends that counsel rendered ineffective assistance by failing to fully advise him of defenses and mitigation evidence prior to his waiver of a penalty phase jury. The Supreme Court of Florida addressed Petitioner's claim that his waiver of a jury trial was unknowing and involuntary due to counsel's failure to investigate and advise him of

mitigation in two parts.  First, the court determined that contrary to Petitioner's assertions,

trial counsel had discussed the elements of, and the defenses to, the crimes of which

Petitioner was accused and that no valid defenses to those crimes existed.  *Lynch*, 2 So. 3d

at 70.  The state court also noted that both Figgatt and Caudill had testified that potential

aggravators had been discussed with Petitioner prior to his waiver of a penalty phase jury.

*Id.* at 70-71.  In regards to Petitioner's assertion that counsel should have performed a more

complete investigation of potential mitigating factors prior to recommending that

Petitioner waive a penalty-phase jury, the Supreme Court of Florida explained that

Petitioner could not demonstrate prejudice from counsels' omissions:

> Lynch's "mild cognitive impairment" has not affected his ability to lead an
> otherwise normal life, he is of average overall intelligence, and he has never
> connected this "impairment" to his actions on March 5, 1999, or his decisions
> with regard to how to best proceed in this case.  Therefore, Lynch's asserted
> ignorance of hypothetical, unsupported defenses and a comparatively minor
> mental-health diagnosis could not have affected his decision to waive a
> penalty-phase jury.

*Id.* at 70 (internal citations omitted).  Next, the Supreme Court of Florida determined that

counsels' decision to recommend that Petitioner waive a jury during his penalty phase was

strategic:

> Counsel were justifiably concerned that this case involved a thoroughly
> planned and executed murder of a former lover and the accompanying
> murder of her minor daughter.  Trial counsel's recommendation was a
> strategic decision to conduct the penalty phase with the court sitting as the
> fact-finder.  In the words of trial counsel, they were "presenting this to a
> judge who wasn't going to be emotional about the fact that there was a death
> of a child, *and the jury was going to be.*" (Emphasis supplied.)  Lynch has not
> demonstrated prejudice, and it is unclear how further discussion of
> hypothetical defenses, which did not exist in this case, and a comparatively

41

> minor mental-health diagnosis would have altered his decision to forgo a
> penalty-phase jury in favor of a potentially less emotional, highly
> experienced jurist.

*Id.* at 71. The question of whether an attorney's actions were the product of a tactical or

strategic decision is an issue of fact, and a state court's decision concerning that issue is

presumptively correct. *Provenzano v. Singletary*, 148 F. 3d 1327, 1330 (11th Cir. 1998).

At the evidentiary hearing, Figgatt testified that, based on his experience with

another death-penalty case in which a child had been murdered and the sentencing jury

recommended death by vote of eleven to one, presenting evidence surrounding Leah

Caday's death to a jury at the penalty phase would not have been "a good idea." (Ex. F-13

at 75.) Figgatt stated:

> It was in the light of that eleven one death rec [sic] that I was thinking of this
> particular case involving the death of a child and its mother, not by knife out
> of some drunken activity, but rather something that was . . . that had the
> framework of planning and design, and I didn't think a jury was going to be
> of value to us. If anything, a twelve to zero death rec is going to authorize
> a judge to impose a death penalty. We had an eleven one death rec [sic] in
> the Eddie James case. . . . I know I didn't directly answer your question. The
> only benefit I could see was getting . . . presenting this to a judge who wasn't
> going to be emotional about the fact that there was a death of a child, and the
> jury was going to be.

*Id*. at 76. Figgatt also believed that, based on the trial judge's history, Petitioner's guilty

plea, combined with his waiver of the penalty-phase jury, was the best option for Petitioner

in terms of avoiding the death penalty. (Ex. F-13 at 78; Ex. F-14 at 253-54, 276.) Figgatt said

that in making his recommendation, he had considered other factors in addition to the

emotional impact of Leah Caday's death, such as the difficulties jurors have with

understanding non-statutory mitigating factors. (Ex. F-15 at 435-36.) Figgatt testified that this strategy had been successfully used by the public defender's office to avoid the death penalty. (Ex. F-14 at 251-53.) Indeed, at the change of plea hearing, the State objected to Petitioner's request to waive a jury, noting that "[t]he State's position is that this particular strategy has been employed a number of times by the Public Defender's office in this circuit. The track record so far is in every case it has been a successful strategy to avoid the imposition of the death penalty." (Ex. A-2 at 383.) Figgatt testified that, had he been able to present evidence of brain damage, he might have advised Petitioner differently in terms of waiving his right to a jury because juries are more receptive to a mitigator such as brain damage. (Ex. F-13 at 81.) However, Figgatt later retreated from that position stating that, even in light of all the additional mitigation advanced by Petitioner, he could not say whether his recommendation to waive a jury at sentencing would have changed. (Ex. F-14 at 248.)

Caudill testified that pleading guilty and waiving a jury at the penalty phase were strategic decisions. (Ex. F-18 at 1090.) Caudill was concerned with the emotional aspects of the death of a child and the possibility that sordid details of Petitioner's past could be revealed in the courtroom if the case proceeded to trial. (Ex. F-18 at 1090-91.) Caudill indicated that he was aware that the trial judge had been very active in death penalty litigation, and he felt that the judge would understand the role of aggravating circumstances and the applicability of mitigating circumstances better than a jury. (Ex. F-18 at 1092.)

Based on the record and counsels' testimony, Petitioner has not overcome the presumption that counsels' decision to advise Petitioner to waive a jury at penalty phase was a strategic one. Nevertheless, even when a decision is strategic, it is not immune from attack unless it was a reasonable strategy. *Strickland*, 466 U.S. at 691 (to be considered a constitutionally adequate strategic choice, the decision must have been made after counsel conducted reasonable investigations or made a reasonable decision that makes investigation unnecessary). In *Wiggins*, the Supreme Court held that the traditional deference owed to the strategic judgments of counsel is not justified where there was not an adequate investigation "supporting those judgments." 539 U.S. at 539.

In the instant case, both Dr. Cox and Dr. Olander had examined Petitioner prior to his waiver of a jury. Therefore, counsel were, or should have been, aware of potential cognitive impairment evidence at the time they advised Petitioner to waive a jury. It was unreasonable for counsel to advise Petitioner to waive a jury without first adequately investigating and advising him of the extent of available mental health mitigation, including his cognitive impairment, particularly given that counsel should have been aware of the potential existence of this powerful mitigation evidence as it was referenced by Dr. Cox in his report. In fact, Figgatt initially testified at the post-conviction hearing that if he had been able to present brain damage as mitigation, he likely would have advised Petitioner differently about waiving a jury because juries are more receptive to brain

damage than to mental illness resulting from a person's upbringing.[6] (Ex. F-13 at 81-82.)

Accordingly, counsel rendered deficient performance by advising Petitioner to waive a jury

at penalty phase prior to adequately investigating and advising him of a substantial mental

health mitigating factor.

Even if counsels' performance was deficient, in order to succeed on this

ineffective-assistance-of-counsel claim, Petitioner must establish prejudice resulted from

the deficiency. *Strickland*, 466 U.S. at 668. Petitioner may establish prejudice by showing

that, but for counsels' deficient advice, he would not have waived his right to a jury at

sentencing. *See Hill*, 474 U.S. at 57-59; *Nelson v. Hvass*, 392 F.3d 320, 322-324 (8th Cir. 2004)

(defendant not entitled to relief where he failed to show that he would not have waived

jury had his attorney properly advised him as to his jury right); *compare Green v. Lynaugh*,

868 F.2d 176, 178 (5th Cir. 1989) (no prejudice absent showing jury would have reached

different result).

The Supreme Court of Florida applied the *Hill* prejudice standard and determined

that, even had Petitioner been informed of "hypothetical, unsupported defenses and a

comparatively minor mental-health diagnosis," he had not shown that he would have

insisted upon a jury at sentencing. *Lynch*, 2 So. 3d at 71. Initially, this Court notes that the

state court's determination that Petitioner has not demonstrated prejudice resulting from

counsels' failure to investigate and pursue Petitioner's claims based on spousal privilege,

---

[6]Figgatt subsequently testified that he did not know if he would have advised
Petitioner to waive a jury had he known about Petitioner's cognitive impairment and other
mitigation evidence. (Ex. F-14 at 248.)

the Fourth Amendment, and a firearms expert prior to advising him to waive a jury is objectively reasonable.[7]  However, in light of the evidence presented at the post-conviction hearing of Petitioner's cognitive impairment, the Supreme Court of Florida unreasonably discounted the weight and the importance of the available mental health mitigation of which Petitioner was not apprised prior to his waiver of a jury.  *See* discussion, *supra* Claim One(A)(1)(b)(iv); 28 U.S.C. § 2254(d)(2).

Petitioner was involved in his own defense and knew that mental health would be the lynchpin of his mitigation defense as is evidenced by letters sent to counsel prior to his waiver of the jury trial.  In a letter dated February 9, 2000, Petitioner told counsel that he was "leaning towards a religious (or lack thereof) Satanic influence which I will explain either in a letter to your office or in person next time you visit me."  (Ex. F-4 at 588.)  In a letter written on August 29, 2000, Petitioner queried whether he would be examined by another mental health expert and opined that the female doctor who had examined him was "more helpful."  (Ex. F-4 at 594.)  In the same letter, Petitioner expressed concern that Judge Eaton would be harsher in sentencing than the judge initially assigned to his case. (Ex. F-4 at 594.)

Figgatt noted that, although his mitigation work was not complete at the time he advised Petitioner to waive a jury trial, he had discussed with Petitioner plans regarding the mental health  mitigation "to give something [sic] weight on the other side." (Ex. F-13 at 67, 74.)  Both Figgatt and Caudill believed that Petitioner was able to understand the

[7]These claims will be discussed more fully *infra*.

advice and strategy given to him by counsel.  (Ex. F-13 at 69; Ex. F-18 at 1101.)  Given

Figgatt's admission that brain damage is a compelling mitigator for a jury to consider,

Petitioner's reliance on his mental health as the only weighty mitigating factor in his

defense, and Petitioner's concern about Judge Eaton's potential harshness, a reasonable

probability exists that Petitioner would not have waived a jury at sentencing had counsel

adequately investigated Dr. Cox's original diagnosis and advised Petitioner of his cognitive

impairment.  *See Sears*, 130 S. Ct. at 3265 (noting the fact "that a theory might be reasonable,

in the abstract, does not obviate the need to analyze whether counsel's failure to conduct

an adequate mitigation investigation before arriving at this particular theory" resulted in

prejudice).  The Court concludes, therefore, that the state court's denial of this claim was

an unreasonable application of *Hill*.  Accordingly, habeas relief is granted as to this claim.

> **3.** **Spousal Privilege and the Fourth Amendment as Grounds for Suppression of the Murder-Suicide Letter (Subclaims B and C)**
>
> > *a.*     *Failure to Advise Petitioner of Spousal Privilege and Failure to Exclude the Murder-Suicide Letter from Evidence*

Petitioner contends that a "murder-suicide" letter introduced at the penalty-phase

proceeding was inadmissible under the marital communication privilege (also known as

"spousal privilege"), and counsel's failure to move to suppress the letter resulted in

ineffective assistance.  In support of this claim, Petitioner argues that the murder-suicide

letter prejudiced him because the letter was the basis for the state courts' finding of the

CCP aggravating factor.  (Doc. No. 13 at 43.)  Petitioner also asserts that, had counsel

investigated and advised him about the spousal privilege, he would not have waived a

penalty-phase jury.  (Doc. No. 1 at 4-5.)

Petitioner maintains that the state courts erroneously determined that he had asked his wife to send the murder-suicide letter to Roseanna Morgan's parents, thereby waiving spousal privilege.  As support for this assertion, Petitioner points to a portion of the letter which reads:

> In blue stacked crates in garage by door, on my side you will see computer gaming magazines on top shelf, left side top one says "50 best games".  On bottom most magazine of pile you will find copy of a letter she gave me Jan. 11, and a card she gave me Feb. 2, a week before it ended.  You can see how serious we were and how animalistic she was sexually in card.  She loves Steven too, also fed him bottle, changed his diaper gave him bananas.  Make copies of the letter and card for me and copies of pics on drive, just print them out on printer, don't have to be full page just 4 x 6 or so.  I want you to send copies of letter + card and pictures to her family . . . I want them to have a sense of why it happened, some decent closure, a reason and understanding, they are good parents like yours.  I want them to know what she did, the pain she caused, that it was not just a random act of violence.

(Ex. F-1 at 178.)  Petitioner argues that this portion of the murder-suicide letter actually directed Virginia Lynch to send the January 11th letter, the February 2nd card, and some nude photographs of Roseanna Morgan to Morgan's parents.  (Doc. No. 13 at 44.) Petitioner contends that the Supreme Court of Florida did not address federal law in its adjudication of this claim and that "the state courts failed to recognize clearly established federal law on marital privilege and the significance of the privilege."  (Doc. No. 13 at 45.)

Petitioner raised this issue in his Rule 3.851 motion.  In denying the claim, the post-conviction court determined that it was illogical to conclude that Petitioner was merely directing his wife to send copies of the January 11th letter and the February 2nd card to

Morgan's parents because doing so "would not have accomplished Lynch's stated purpose of providing the victim's parents and Virginia Lynch's parents 'a sense of why it happened, some decent closure, a reason and understanding. . . . I want them to know the pain she caused and that it was not some random act of violence. . . .'" (Ex. F-12 at 2042.)  The court noted that the January letter and February card referenced in the murder-suicide letter did not provide "reason and understanding" of why "it happened" and did not explain the "pain [Morgan] caused."  *Id.*  Rather, those documents merely contained "expressions of affection" and Petitioner's expressions of frustration over the break-up of his relationship with Morgan without explaining the pain she had caused.  *Id.*  Accordingly, the post-conviction court concluded that only the murder-suicide letter accomplished Petitioner's stated purpose, and therefore, Petitioner had intended the contents of the murder-suicide letter to be disclosed both to the victim's parents and to Virginia Lynch's parents.  *Id.*  The court also determined that much of the information contained in the murder-suicide letter was cumulative to Petitioner's statements made to a 911 operator and to a crisis negotiator.  *Id.* at 2042-43.

On appeal, the Supreme Court of Florida determined that, "based upon the content of the letter, counsel may have possessed a non-frivolous basis" on which to argue that Petitioner did not intend for his wife to distribute the murder-suicide letter.  *Lynch*, 2 So. 3d 47 at 64.  However, the court further determined that this interpretation of the murder-suicide letter was "very debatable" and that "the post-conviction court correctly interpreted the letter, and its more persuasive interpretation is supported by competent,

substantial evidence." *Id.* Accordingly, the Supreme Court of Florida determined that the

spousal privilege did not apply to the letter because Petitioner *had never* intended the letter

to constitute a confidential communication:

> Section 90.504(1), Florida Statutes (2000), the subsection codifying the
> confidential marital-communications privilege, states: "A spouse has a
> privilege during and after the marital relationship to refuse to disclose, and
> to prevent another from disclosing, *communications which were intended to be
> made in confidence between the spouses while they were husband and wife*."
> (Emphasis supplied.)  Therefore, despite the fact that we broadly construe
> this privilege to protect spousal confidences, the confidential
> marital-communications privilege only applies to communications that were
> *originally intended to be confidential*.  Here, the letter itself represented Lynch's
> entreaty to his wife that she disclose all of this information to the victims'
> family in Hawai'i.  Therefore, Lynch never intended for this message to
> constitute a confidential marital communication.

*Id.* at 65 (emphasis in original).  Because the spousal privilege did not apply to the letter,

as it was never intended to be confidential, the court determined that Petitioner could show

no prejudice from counsel's failure to seek exclusion of the murder-suicide letter.  *Id.* at 67.

The Supreme Court of Florida determined that the same analysis applied to the penalty-

phase of the trial.  *Id.* at 77.

Nothing in the record, or in Petitioner's submissions, suggests that the state courts'

factual findings regarding the intended recipients of Petitioner's murder-suicide letter were

unreasonable.  The January 11th and February 2nd correspondence, referenced in the

murder-suicide letter, from Morgan to Petitioner consisted of expressions of affection,

written before the break-up.  (Ex. F-8 at 1431-34.)  This earlier correspondence did not

address the issues delineated by Petitioner in his murder-suicide letter.

In contrast, the four page murder-suicide letter attempts to provide justification for the violence by describing the depth of the relationship between Morgan and Petitioner, explaining that he had loaned Morgan a great deal of money, and when Morgan reunited with her husband, she refused to pay the credit cards bills. At the end of the letter, Petitioner writes:

> That is why she must pay the price. She built me up, made me love her, loved me, gave me that card on Feb 2, we made love on Feb 6 then on [unintelligible] she ended it. You cannot tell someone words like that, then expect them to turn off like a switch. [Then] there's the $ worry.

(Ex. F-1 at 179.) As noted by the state courts, the murder-suicide letter accomplished Petitioner's stated purpose of explaining why "it" happened. Thus, it was reasonable for the state courts to determine that Petitioner intended Virginia Lynch to send the murder-suicide letter to Morgan's parents, and thus, the spousal privilege did not apply to the letter because it was never intended to be a confidential communication.

Other than expressing disagreement with the state courts, Petitioner has not presented clear and convincing evidence that the courts unreasonably determined that the spousal privilege did not apply to the murder-suicide letter. Under Florida law, "[a] spouse has a privilege during and after the marital relationship to refuse to disclose, and to prevent another from disclosing, *communications which were intended to be made in confidence* between the spouses while they were husband and wife." Fla. Stat. § 90.504(1) (2000) (emphasis added). Because Petitioner intended for Virginia Lynch to share the contents of the letter with Morgan's parents, the spousal privilege did not apply under

Florida law, and counsel were not ineffective for failing to move for exclusion of the letter. Even if counsel may have possessed a non-frivolous basis on which to argue that Petitioner had not intended distribution of the murder-suicide letter, given the state courts' factual determinations, this argument would have failed. Thus, Petitioner has failed to demonstrate that a reasonable probability exists that he would not have waived a jury or that the outcome of the penalty phase would have been different if trial counsel had advised him about the spousal privilege or moved to suppress the letter given the state courts' determination that a motion to suppress would not have succeeded. *See Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002) (counsel was not ineffective for failing to raise issues clearly lacking in merit).

In addition, even assuming *arguendo* that counsel should have sought suppression of the murder suicide letter, Petitioner cannot show prejudice. There was sufficient evidence in the record to support the sentencing court's finding of the CCP aggravator for Morgan's murder, even without consideration of the murder-suicide letter. *See Lynch*, 841 So. 2d at 372-73 (finding each element of the CCP aggravator without consideration of the murder-suicide letter). Petitioner parked his vehicle away from the victims' apartment in a place where the victims could not see it. He took three guns to the apartment and held Caday hostage in the apartment for more than thirty minutes before Morgan came home. He confronted Morgan at the door and shot her several times in the legs before she entered the apartment. After dragging Morgan into the apartment, he waited approximately five to seven minutes before he retrieved another firearm and shot her in the back of the head,

execution style, killing her.  During the course of the murders,  Petitioner was able to call

Virginia Lynch three times from the victims' apartment, yet at no time did Petitioner

withdraw from the apartment or seek help for his victims. *See* discussion *infra* Claim Nine.

Because Petitioner can demonstrate neither deficient performance nor prejudice, this

claim fails under *Strickland* and is denied pursuant to Section 2254(d).[8]

> b.   *Failure to Advise Petitioner of His Fourth Amendment Rights Against Search of His Home and the Seizure of the Murder-Suicide Letter*

Petitioner asserts that counsel were ineffective for failing to: (1) advise him of, or

object to, the warrantless search of his home and seizure of the murder-suicide letter; and

(2) object to the over-broad warrant later obtained by law enforcement and thereby failing

to exclude the letter in evidence during his penalty phase.  (Doc. No. 1 at 5.)[9]  Specifically,

Petitioner argues that the Supreme Court of Florida made an unreasonable factual

determination when it found that  the police were in Virginia Lynch's home by consent and

unreasonably applied the law by concluding that the incriminating nature of the letter was

immediately apparent.  (Doc. No. 13 at 52-53.)

---

[8]Petitioner's second argument, that the state courts failed to recognize clearly established federal law on marital privilege, is equally unavailing.  While Petitioner cites both Florida and federal law indicating the *existence* of spousal privilege, he provides no support for his assertion that the privilege cannot be waived under federal law or that privilege claims must be evaluated under federal law.

[9]The Supreme Court of Florida appeared to expressly address this claim only in regards to Petitioner's guilt-phase claim.  Petitioner, however, appears to concede that the claim was effectively addressed by the Supreme Court of Florida in regards to the penalty-phase claim (Doc. No. 13 at 46) ("The Supreme Court of Florida addressed this claim in depth as part of its guilt phase analysis and relied on that in denying Mr. Lynch's penalty phase claim. *See Lynch v. State*, 2 So. 3d at 67-68.").

Petitioner raised the issue of the admissibility of the murder-suicide letter in his Rule 3.851 motion.  The trial court denied the claim on the grounds that "the letter, having been properly delivered to Lynch's wife, was her property and was lawfully obtained by law enforcement since Lynch had no further ownership interest in it." (Ex. F-12 at 2036.)  On appeal, the Supreme Court of Florida declined to address the performance prong of the *Strickland* standard, determining instead that Petitioner could not show prejudice from counsels' failure to seek its exclusion from evidence because the letter was admissible under the "plain view" doctrine.  *Lynch*, 2 So. 3d at 67.  Specifically, the court determined that the police officers who took the letter from Virginia Lynch had probable cause to seize the letter because they were in her home with consent, were already independently aware of the murder-suicide letter, and Mrs. Lynch was reading the letter in the officers' presence. *Lynch*, 2 So. 3d at 68.

Generally, the Fourth Amendment requires that an officer obtain a warrant before conducting a search. U.S. Const. amend. IV.  A warrant is not needed, however, if the defendant voluntarily consents to the search.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  For a warrantless search to be constitutionally valid on the basis of consent, that consent must be given voluntarily by an individual possessing authority over the searched premises.  *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).  The voluntariness of consent is a "question of fact dependent upon the totality of the circumstances."  *Schneckloth,* 412 U.S. at 227.  A determination of a factual issue made by a state court is presumed correct unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28

54

U.S.C. § 2254(e)(1).

Petitioner argues that the state court made an unreasonable determination of the facts because Mrs. Lynch did not consent to the search of her home or the seizure of the letter. (Doc. No. 13 at 47, 52.) In her sworn interview with the state attorney, Mrs. Lynch does not explicitly state whether she invited the police into her home. (Ex. F-5 at 804-39.) Nevertheless, Mrs. Lynch called 911 after her husband called her from Morgan's apartment, and she indicated that when the policeman arrived at her home, she believed that he was there to investigate the shootings. *Id.* at 834-35; Ex. A-4 at 98. When the police arrived, a policeman searched the home. *Id.* at 836. Moreover, at Petitioner's sentencing hearing, Mrs. Lynch testified that after she found the letter, she "was reading it, and [the officer] said he has to have it as evidence, so I went ahead and give [sic] it to him." (Ex. A-4 at 100.) The circumstances surrounding the police's seizure of the murder-suicide letter could reasonably be construed as consensual. The Supreme Court of Florida did not clearly err in concluding that Mrs. Lynch granted consent to search and voluntarily relinquished the murder-suicide letter. Petitioner has not carried his burden to rebut the presumption of the correctness of the state court's factual finding by clear and convincing evidence. 28 U.S.C. § 2254(e).

Neither has Petitioner established that the state court unreasonably applied clearly established federal law when it determined that the evidentiary nature of the letter was immediately apparent. The "plain view" doctrine permits a warrantless seizure where: (1) an officer is lawfully located in the place from which the seized object could be plainly

viewed and has a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent. *Horton v. California*, 496 U.S. 128, 136-37 (1990); *Rimmer v. State*, 825 So. 2d 304, 313 (Fla. 2002). "For an item's incriminating character to be 'immediately apparent,' the police merely need probable cause to believe that the item is contraband." *United States v. Wright*, 324 F. App'x 800, 804 (11th Cir. 2009) (citing *Texas v. Brown*, 460 U.S. 730, 741-42 (1983)). "Probable cause" is a "flexible, common-sense standard" that merely requires that "the facts available to the officer would 'warrant a man of reasonable caution in the belief,' that certain items may be . . . useful as evidence of a crime." *Brown*, 460 U.S. at 742 (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)).

In her sworn statement, Mrs. Lynch attested that the police officer who came to her home knew of the existence of the murder-suicide letter and was searching for it. (Ex. F-5 at 835.)[10] She was reading the letter when the officer said he needed it as evidence. (Ex. A-4 at 100.) Petitioner argues that the nature of the letter could not have been immediately apparent to the officer because the officer would have had to read the letter to determine whether it was written by Petitioner and whether it referenced the offenses. (Doc. No. 13 at 54-55.) Petitioner's interpretation of the plain view doctrine is too narrow. The officer did not need to know that the letter was evidence of the offenses; rather, he needed probable cause to believe that the letter was the one for which he was searching. *See United*

---

[10]The day following the murders, Mrs. Lynch told police that she was reading the letter while simultaneously speaking with the 911 dispatcher. (Ex. F-5 at 798.)

*States v. Smith*, 459 F.3d 1276, 1293 (11th Cir. 2006); *Brown*, 460 U.S. at 741 (the phrase "immediately apparent" does not imply "that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine."). Common sense dictates that the officer could have reasonably believed that the letter he observed Mrs. Lynch reading while he was searching her home was the same letter she identified to the 911 dispatcher as having been written by Petitioner. *See United States v. Herzbrun*, 723 F.2d 773, 775 (11th Cir. 1984) ("[P]robable cause must not be judged with clinical detachment, but with a common sense view to the realities of normal life."); *United States v. Blum*, 753 F.2d 999, 1002 (11th Cir. 1985) ("The appellant argues that there is no way the agent could immediately have recognized a box full of miscellaneous papers as evidence without going through the box and reading each item to determine its evidentiary importance. . . . Once the agents saw [some of the evidence, however,] the evidentiary value of these would be apparent.").

Because Mrs. Lynch consented to the officer's search of the home she shared with Petitioner, the officer was lawfully in the home when he observed Mrs. Lynch reading the murder-suicide letter in plain view, the incriminating character of which was immediately apparent. Therefore, the murder-suicide letter was admissible under the plain view doctrine, and no search warrant was necessary. Because the murder-suicide letter was admissible, even had counsel moved to exclude it from evidence or objected to an overly broad warrant, there is not a reasonable probability that the result of the sentencing proceedings would have been different. *See Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986)

(where a Sixth Amendment violation is claimed in the context of counsel's failure to present a Fourth Amendment claim, the petitioner must show that the Fourth Amendment claim is meritorious). Furthermore, the evidence supporting the CCP aggravator was substantial even without consideration of the letter. Accordingly, the state court's determination on this issue was not contrary to, or an unreasonable application of, federal law. *See Brownlee*, 306 F.3d at 1066. This subclaim is denied.

### 4.   *Firearms Expert or Accidental Shooting*

Petitioner alleges that counsel were ineffective for failing to consult an independent firearms expert to testify that each of the seven shots fired from a Glock firearm was accidental. (Doc. No. 13 at 66.) Petitioner contends that he was prejudiced by counsel's failure because an independent firearms expert could have presented an accidental discharge defense in support of mitigation, lessening the impact of the CCP and HAC aggravating circumstances. (Doc. No. 1 at 5.) Petitioner also argues that the trial court independently examined the Glock used in the murders and based his denial of the claim partly upon the improper in-chambers examination of the firearm. (Doc. No. 1 at 15.)[11]

Petitioner raised this issue in his Rule 3.851 motion. An evidentiary hearing was held on the claim, and Petitioner presented the testimony of Roy Ruel ("Ruel") to testify that each of the seven shots from the Glock pistol could have been fired accidently. (Ex. F-14 at 353-95.) The post-conviction court found Ruel's testimony not to be credible, calling him "among the least credible experts this Court has ever heard testify." (Ex. F-12 at 2037.)

---

[11] This portion of the claim is repeated and discussed in claim two.

The trial court also determined that it was inconceivable that the Glock could have been accidentally fired seven times "and accidentally hit the same person four of the seven times. In such a situation, the person is a target and not the unintended victim of accidental discharge." *Id.*

Petitioner takes issue with the trial court's determination of Ruel's credibility, arguing that the trial court's rejection of Ruel was not based on substantial evidence in the record. (Doc. No. 13 at 67.) Petitioner offers no support for his contention that the trial court was not allowed to discount a witness' credibility unless the witness is impeached or contradicted. Ruel's testimony was completely contrary to evidence presented at the penalty phase of Petitioner's trial by the State's firearms expert, by a neighbor who witnessed part of the incident, and by the medical examiner.

Nannette Rudolph, the State's firearms expert, testified that the Glock operated properly. (Ex. A-5 at 284-316.) In contrast, Ruel testified that the Glock had a very short trigger pull and that Rudolph had not disclosed such during her testimony. (Ex. F-14 at 376.)

Morgan's neighbor, Yahira Morales ("Morales") testified that, after hearing a disturbance, she looked through her apartment peephole, across the hall from Morgan's apartment, and watched Petitioner drag a screaming Roseanna Morgan by the wrists. She said that Petitioner knocked on Morgan's apartment door, telling the occupant to "hurry up, open the door, your mom is hurt." (Ex. A-4 at 61.) Morales observed that Morgan was bloody only from the waist down. *Id.* at 62. Morales heard three gunshots after Petitioner

dragged Morgan into the apartment.  *Id.* at 63.  Ruel completely disregarded Morales'

testimony because he believed that at least one of the three shots she heard must have been

fired with the apartment door open and because he "was very dubious that one could see

all this and hear all this through . . . a closed door with just an eye piece."  Accordingly, he

credited Morales with a "very vivid imagination" and rejected her testimony.  (F-14 at 385,

391.)

Medical examiner Charles Siebert indicated that Morgan was initially shot in the

legs.  (Ex. A-7 at 689.)  Siebert further testified that Morgan had defensive wounds on her

hands that were inconsistent with being shot first in the head.  *Id.* at 690.  In contrast, Ruel's

theory was that Morgan was accidentally shot outside the apartment four times, with the

apartment door open, and with the first shot necessarily entering the back of her head and

exiting her eye.  Petitioner then accidently fired three additional shots, also with the

apartment door open, before dragging Morgan inside the apartment.  (Ex. F-14 at 393.)

Ruel testified that the Glock shot to Morgan's head could have only happened outside

because no bullets were embedded in the floor of the apartment.  *Id.* at 388.

Determinations of credibility are best made by the trial court judge who can assess

the demeanor and candor of the witnesses.  *Gore*, 492 F.3d at 1300 (noting that while a

reviewing court also gives a certain amount of deference to credibility determinations, that

deference is heightened on habeas review), citing *Rice v. Collins*, 546 U.S. 333, 341-42 (2006)

(stating that "[r]easonable minds reviewing the record might disagree about the [witness']

credibility, but on habeas review that does not suffice to supersede the trial court's

credibility determination"). The trial court was entitled to disregard Ruel's testimony and to credit the contrary evidence presented by the State's witnesses at the penalty phase. Petitioner has offered no basis to overcome the presumption of correctness entitled to a credibility determination on habeas review.

The Supreme Court of Florida affirmed the trial court's denial of this claim, determining that the evidence presented during both the penalty phase and post-conviction proceedings was "*clearly inconsistent* with an accidental-discharge defense." *Lynch*, 2 So. 3d at 68 (emphasis in original).

> The only "evidence" contained in the record supporting an accidental-discharge claim consisted of (1) Lynch's self-serving rationalization that he accidentally shot Roseanna Morgan four times, accidentally shot Leah Caday in the back, and then switched weapons to "put [Morgan] out of her misery" by intentionally shooting her in the back of the head; and (2) Roy Ruel's *unsubstantiated assertion* during the postconviction proceeding that one can unintentionally discharge a properly functioning Glock G30 seven separate times, while striking an unintended target with nearly sixty-percent accuracy (Lynch fired seven shots from the Glock and struck Morgan four times). Trial counsel made a strategic decision not to assert a baseless defense, and "[c]ounsel's strategic decisions will not be second-guessed on collateral attack." *Johnson v. State*, 769 So. 2d 990, 1001 (Fla. 2000) (citing *Remeta v. Dugger*, 622 So. 2d 452 (Fla.1993)).

> The strategic decision of trial counsel not to pursue an accidental-discharge defense did not affect Lynch's election to plead guilty *because the facts of this case are simply inconsistent with accidental discharge.* Moreover, this analysis applies with equal force to Lynch's penalty-phase accidental-discharge claim.

*Id.* at 69-70 (emphasis in original).

Even if this Court completely ignored the state court's credibility determination, a review of trial counsels' testimony supports the determination of the Supreme Court of

Florida that the decision to forego an accidental discharge defense was a reasonable strategic decision. At the evidentiary hearing, Figgatt testified that he had not investigated the theory of a misfiring Glock because more than one gun was used in the murders and the idea of a misfire made no sense because the Glock is not an automatic pistol. (Ex. F-13 at 91, 94.) Figgatt believed that he could not make a credible argument that Petitioner accidentally pulled the trigger seven separate times. (Ex. F-15 at 406-08.) Likewise, Caudill testified that he believed nothing would have been gained by presenting an accidental discharge defense because, under the theories of felony murder and transferred intent, Petitioner still would have been guilty of first degree murder. (Ex. F-18 at 1111-12.)

The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and the state court's decision concerning that issue is presumptively correct. *Provenzano*, 148 F.3d at 1330. Based upon information in the record, counsel made a reasonable strategic decision to forego an accidental discharge defense. Trial counsel's strategic and tactical choices are largely unassailable. *See Strickland*, 466 U.S. at 690-91; *Mincey v. Head*, 206 F.3d 1106, 1143 (11th Cir. 2000) ("We must respect the counsel's tactics if they seem 'reasonable considering all the circumstances.'" (quoting *Strickland* )). Based on the record, the state court's determinations that an accidental discharge defense would have been meritless and counsel were not ineffective for failing to raise this claim at the penalty phase are neither contrary to, nor an unreasonable application of, *Strickland*. *See Brownlee*, 306 F.3d at 1066. Thus, this subclaim is denied pursuant to Section 2254(d).

B.      *Claim Two*

Petitioner asserts that the post-conviction judge demonstrated actual or perceived bias in the post-conviction proceeding.  In support of this claim, Petitioner maintains that the judge made himself a material witness and demonstrated bias by testing the Glock firearm used during the offenses in chambers without notice to the parties.  Petitioner further argues that the judge demonstrated that he had marked personal feelings against Petitioner by refuting Petitioner's definition of *ex parte* and by making statements such as, "Lynch takes the Court to task", in the Second Amended Order Denying Motion for Post-Conviction Relief.

Petitioner raised this claim on appeal from the denial of his Rule 3.851 motion.  In denying relief, the Supreme Court of Florida reasoned that the judge, as the fact-finder, "merely examined evidence" and "drew nonscientific conclusions from his manual manipulation of the weapon, which were consistent with the testimony of the firearms experts."  *Lynch*, 2 So. 3d at 80 (citing Fla. R. Crim. P. 3.400(a)(3) for the proposition that "[t]he court may permit the jury, upon retiring for deliberation, to take to the jury room . . . all things received in evidence other than depositions.").  The court held:

> [T]he postconviction court's in-camera manual manipulation of the Glock's trigger to corroborate the claims of the firearms experts that (1) the gun was properly functioning, and (2) that the trigger pull was within the normal range, was not improper and did not display judicial bias.  The judge did not engage in any independent scientific or ballistics testing.  Rather, he simply held the weapon-which had been admitted into evidence-and pulled the trigger.  None of his conclusions required any specialized training or knowledge beyond that which had been imparted by the testifying firearms experts; further, all of his conclusions were drawn from and supported by

the testimony of these experts.

* * *

In sum, we conclude that recusal or disqualification was unwarranted in this case because the judge, sitting as the factfinder, did not exhibit any bias when he examined a murder weapon that was indisputably in evidence. The postconviction court thus properly denied Lynch's motion to disqualify as legally insufficient. However, in the future, we caution that judges should not interpret our denial of an emergency petition for writ of prohibition here as a license to address the merits of the underlying recusal or disqualification motion.

*Id.* at 79-80.

The Supreme Court of the United States has held that the Due Process Clause provides criminal defendants with a right to a fair and an impartial judge who is neutral, detached, and free from "actual bias." *In re Murchison*, 349 U.S. 133, 136 (1955); *see also Bracy v. Gramley*, 520 U.S. 899, 905-06 (1997). In making a determination of whether the trial judge was biased, the inquiry must include "whether there was actual bias on [the judge's] part, . . . [and] whether there was 'such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused.'" *Taylor v. Hayes*, 418 U.S. 488, 501 (1974) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 588 (1964)). "In only two types of cases has the Supreme Court actually held that something less than actual bias violates constitutional due process - (1) those cases in which the judge 'has a direct, personal, substantial pecuniary interest in reaching a [particular] conclusion,' . . .; and (2) certain contempt cases, such as those in which the 'judge becomes personally embroiled with the contemnor. . . .'" *Railey v. Webb*,

540 F.3d 393, 399 (6th Cir. 2008) (quoting *Turney v. Ohio*, 273 U.S. 510, 523 (1927) and *Murchison*, 349 U.S. at 141).

Moreover, "a judge's reliance, in imposing the death penalty, on information not disclosed to the defendant or his attorney violate[s] the defendant's rights to due process and freedom from cruel and unusual punishment." *Proffitt v. Wainwright*, 685 F.2d 1227, 1253 (11th Cir. 1982) (citing *Gardner v. Florida*, 430 U.S. 349, 362 (1977)). "[D]eath sentences may not constitutionally be imposed on the basis of information that the capital defendant has been afforded no opportunity to rebut." *Id.* (citing *Gardner*, 430 U.S. at 362).

The Eleventh Circuit has applied a harmless error analysis in limited circumstances when a *Gardner* violation is found to exist. In *Delap v. Dugger*, 890 F.2d 285, 302 (11th Cir. 1989), the Eleventh Circuit concluded that the *Gardner* violation was harmless beyond a reasonable doubt. The appellate court noted that "[t]he trial judge's consideration of the statutory aggravating factors could not have been affected by anything the judge observed on his visit to death row, as all of the factors relate either to the crime itself or to the defendant's prior criminal record." *Delap*, 890 F.2d at 302.

The record in this case supports the state court's denial of this claim. The post-conviction judge, who was also the trial judge, served as the fact-finder in this case. The Glock was admitted into evidence during the penalty phase of the trial. The State's expert witness testified during the penalty phase regarding the operation of the Glock, and Ruel testified during the post-conviction proceeding about the operation of the Glock. The judge did not utilize facts or evidence of which the parties were not aware in determining

whether counsel was ineffective for failing to investigate and call a firearms expert to testify about the accidental firing of the gun.   Instead, the judge, as the fact-finder, considered the evidence presented regarding the functioning of the firearm and evaluated the firearm in accordance with the experts' testimony by pulling the trigger of the firearm. The judge did not actually shoot the firearm or conduct ballistics testing of the weapon.

Moreover, the statements that Petitioner contends demonstrate judicial bias were made after the judge had ruled on the merits of Petitioner's post-conviction motion.  The statements also were not of such a nature as to demonstrate that the judge had marked personal feelings against Petitioner.  Furthermore, Petitioner's criticisms of the judge were not the type of "insults. . . apt to strike 'at the most vulnerable and human qualities of a judge's temperament. . . .'"  *Mayberry v. Pennsylvania*, 400 U.S. 455, 466 (1971) (quoting *Bloom v. Illinois*, 391 U.S. 194, 202 (1968)).  Petitioner has not demonstrated that the judge's comments demonstrate actual bias warranting relief pursuant to Supreme Court precedent, nor do the statements show perceived bias of a nature that has been determined by the Supreme Court to violate due process.  *See, e.g., Buntion v. Quarterman*, 524 F.3d 664, 672-76 (5th Cir. 2008) (holding in a capital case that trial judge's statements such as, "sooner or later" the defendant would be convicted and executed, and judge's actions, which included *ex parte* interaction with defense counsel, did not establish either actual or presumptive bias pursuant to clearly established Supreme Court precedent).  In sum, the Court concludes that the state court's denial of this claim was not objectively unreasonable given Supreme Court precedent.  Accordingly, claim two is denied pursuant to Section 2254(d).

66

## C.     Claim Three

Petitioner contends that the trial court denied him his due process right to present evidence in support of his claims of ineffective assistance of counsel.   Specifically, Petitioner argues that the trial court refused to allow him to present the testimony of Robert Norgard ("Norgard"), an attorney with twenty-five years of experience defending capital cases, to establish the prevailing norms for capital defense attorneys in Florida in 1999 through 2001.

Petitioner raised this claim on appeal from the denial of his Rule 3.851 motion.   In denying this claim, the Supreme Court of Florida first noted that Petitioner had failed to raise a due process objection to the trial court's refusal to allow Norgard's testimony, and thus, the claim was not cognizable on appeal.   *Lynch*, 2 So. 3d at 80-81.   Nevertheless, the court  determined that Petitioner failed to demonstrate a due process violation based on the trial court's evidentiary ruling.   *Id*. at 81.   The court reasoned:

> Lynch provides no decision which has held that a postconviction court abuses its discretion when it precludes expert testimony with regard to the prevailing norms of capital representation.   The High Court's explicit reference in *Strickland* to the ABA guidelines demonstrates that expert testimony is not the only source of evidence to establish standards of capital representation.   Indeed, during the evidentiary hearing, Norgard stated that "there are a number of ways that Capital Collateral Counsel can present to the Court information about what is expected of a criminal defense attorney."   Further, the *Strickland* Court noted that the ABA standards "and the like" are "*only guides*," which indicates that such evidence is not something that must be received into evidence for a postconviction court to properly evaluate trial counsel's effectiveness during a capital case. 466 U.S. at 688, 104 S. Ct. 2052 (emphasis supplied).
>
>      Finally, even if the refusal to admit expert testimony concerning the

norms of capital representation constitutes an abuse of discretion under certain discrete circumstances, it does not here. Under section 90.702, Florida Statutes, expert testimony is admissible only where "specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue." Hypothetically, a situation could exist in which a judge presiding over a postconviction case could receive the testimony of an expert to assist the court in determining whether trial counsel rendered ineffective assistance.

Conversely, here, the presiding postconviction judge has been adjudicating capital cases in Florida for many years. He is extremely seasoned in this field, and even the testifying expert conceded this point. During his testimony, attorney Norgard was of the opinion that a judge who has recently left the bench would not meet the minimum qualifications to serve as lead capital counsel. When the postconviction judge asked Norgard, "You don't think I could get away with it?," Norgard responded, " You probably could. I'd agree with that." (Emphasis supplied.) Thus, expert testimony was not an essential element to assist the postconviction court in addressing this issue.

Expert testimony is not the sole means through which the norms of capital representation are to be established, and this particular postconviction judge is sufficiently familiar with these standards. Therefore, the judge did not abuse his discretion by excluding attorney Norgard's testimony here concerning the standards of capital representation at the time of Lynch's trial. Accordingly, we deny relief on this claim

*Id.* at 81-82.

"Federal habeas corpus relief based on evidentiary rulings will not be granted unless it goes to the fundamental fairness of the trial." *McCoy v. Newsome*, 953 F.2d 1252, 1265 (11th Cir. 1992); *see also Tejada v. Dugger*, 941 F.2d 1551, 1560 (11th Cir. 1991) ("We review questions of state law in federal habeas proceedings only to determine whether the alleged errors were so critical or important to the outcome of the trial to render 'the entire trial fundamentally unfair.'"). The state trial error must have been "material in the sense of a

crucial, critical, highly significant factor." *Tejada*, 941 F.2d at 1560 (quotation and citation

omitted); *see also Shaw v. Boney*, 695 F.2d 528, 530 (11th Cir. 1983) (generally, a federal court

will not review a state trial judge's ruling with respect to the admissibility of evidence; an

erroneous ruling alone does not warrant habeas corpus relief); *Palmariello v. Superintendent*

*of M.C.I. Norfolk*, 873 F.2d 491, 494 (1st Cir. 1989) ("Habeas review does not ordinarily

encompass garden variety evidentiary rulings.").

Petitioner has not demonstrated that the state court's denial of this claim is contrary

to, or an unreasonable application of, *Strickland* or any other case of the Supreme Court of

the United States. *Strickland* explains:

> In any case presenting an ineffectiveness claim, the performance inquiry
> must be whether counsel's assistance was reasonable considering all the
> circumstances. Prevailing norms of practice as reflected in American Bar
> Association standards *and the like*, e.g., ABA Standards for Criminal Justice
> 4–1.1 to 4–8.6 (2d ed. 1980) ("The Defense Function"), *are guides to determining*
> *what is reasonable, but they are only guides*. No particular set of detailed rules
> for counsel's conduct can satisfactorily take account of the variety of
> circumstances faced by defense counsel or the range of legitimate decisions
> regarding how best to represent a criminal defendant. Any such set of rules
> would interfere with the constitutionally protected independence of counsel
> and restrict the wide latitude counsel must have in making tactical decisions.
> See *United States v. Decoster*, 199 U.S. App. D.C., at 371, 624 F.2d, at 208.
> Indeed, the existence of detailed guidelines for representation could distract
> counsel from the overriding mission of vigorous advocacy of the defendant's
> cause. Moreover, the purpose of the effective assistance guarantee of the
> Sixth Amendment is not to improve the quality of legal representation,
> although that is a goal of considerable importance to the legal system. The
> purpose is simply to ensure that criminal defendants receive a fair trial.

*Strickland*, 466 U.S. at 688-89 (emphasis added). Thus, although *Strickland* permits the use

of expert testimony to establish prevailing norms, it does not mandate that such evidence

be admitted.

Furthermore, Petitioner has not shown that the trial court's refusal to allow the admission of Norgard's testimony was so critical or important to the outcome of the post-conviction proceedings as to render the entire proceeding fundamentally unfair.  From the record, it is clear that the trial judge had extensive experience with capital cases as conceded by Norgard.  Additionally, much of Norgard's proffered testimony was premised on decisions from the Supreme Court of the United States and other courts.  Finally, Petitioner presented extensive evidence to support his claims of ineffective assistance of counsel.  As such, claim three is denied pursuant to Section 2254(d).

### D.    Claim Four

Petitioner contends that his Due Process rights under *Brady*,[12] *Giglio*,[13] and their progeny were violated when the prosecutor withheld mitigating evidence and allowed Dr. Reibsame to testify falsely.  The Court will address the *Brady* and *Giglio* claims separately.

### 1.    Brady

Petitioner alleges that the State withheld exculpatory mitigating evidence that was not listed in discovery but was held at the Sanford Police Department Evidence Room or within the State Attorney's files.  Specifically, Petitioner argues that the State withheld his high school records, two commendations for thwarting a robbery from a former employer, notes from Petitioner's mother regarding his birth weight, letters from Petitioner's mother

---

[12] *Brady v. Maryland*, 373 U.S. 83 (1963).

[13] *Giglio v. United States*, 405 U.S. 150 (1972).

indicating the "excessive" closeness of their relationship, a childhood photograph of Petitioner holding a rosary and bible, Petitioner's mother's death certificate indicating the date of her death, Petitioner's marriage certificate, and the marriage certificate of Petitioner's parents. (Doc. No. 1 at 24.) Petitioner contends that this evidence would have been helpful to his mental health expert because the high school records showed a disparity in Petitioner's grades in different subjects and because Petitioner's low birth weight could have been an indicator of brain damage. Petitioner also alleges that "emotional stressors such as spiraling debt or the anniversary of the death of a loved one can trigger mental illness or instability," and therefore, the evidence could have been helpful in mitigation. (Doc. No. 1 at 24-25.)

Petitioner raised this issue in his Rule 3.851 motion. The post-conviction court denied the claim. On appeal, the Supreme Court of Florida determined that the lower court had correctly denied relief on this claim. *Lynch*, 2 So. 3d at 83. The court identified *Brady* as providing the governing legal principles of this claim and articulated the elements of a *Brady* claim. The court determined that no *Brady* violation had occurred because both Petitioner and his counsel were aware of the evidence and simply chose not to examine it:

> Despite his extensive listing of the mitigation evidence that the State allegedly withheld, Lynch neglects to mention that he stored much of the allegedly withheld mitigation in a grey lockbox that the Sanford Police Department seized from his home pursuant to a search warrant. During the post-conviction hearing, collateral counsel extracted items from this lockbox to question trial counsel. This lockbox was listed on the evidence receipt that the State provided to Lynch during pretrial discovery. The search-warrant inventory lists "gray lock box recovered from side of night stand containing bank papers, birth certificates, lawyer paperwork, collectible coins." Further,

Lynch wrote trial counsel expressing his desire that counsel locate the personal items seized from his home.  Lynch referenced his "mother's fireproof safe box," which contained "many irreplaceable items."

Lead trial counsel's testimony shows that he was aware of the lockbox and its location.  When questioned about the search warrant, Mr. Figgatt stated that it included a grey lockbox seized from Lynch's night stand.  Trial counsel did not visit the Sanford Police Department to examine the lockbox.  Lynch had written trial counsel asking them to retrieve items from the lockbox, and trial counsel were aware that the lockbox was stored at the Sanford Police Department.  Further, Lynch was aware of all of this mitigation evidence because he either knew of its existence or it was his personal property.  Consequently, this evidence is not *Brady* evidence because Lynch and defense counsel were aware of its existence and location and simply did not examine it.  This claim lacks merit and the post-conviction court properly denied relief.

*Lynch,* 2 So. 3d at 83 (internal citations omitted).  The record and applicable law supports

the state court's conclusion.

Under *Brady*, "the suppression by the prosecution of evidence favorable to an

accused upon request violates due process where the evidence is material either to guilt or

to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373

U.S. at 87.  There are four components that a defendant must show to successfully assert

a *Brady* violation: (1) that the Government possessed evidence favorable to the defendant;

(2) that the defendant does not possess the evidence nor could he obtain it himself with any

reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4)

that had the evidence been disclosed to the defense, a reasonable probability exists that the

outcome of the proceedings would have been different.  *United States v. Meros*, 866 F.2d

1304, 1308 (11th Cir. 1989) (*per curiam*).  Where, as here, a defendant had knowledge of the

alleged *Brady* material prior to trial, there is no suppression by the government. *United States v. Griggs*, 713 F.2d 672, 674 (11th Cir. 1983) (emphasis in original) ("Irrespective of whether the statement[s] here [were] exculpatory evidence under *Brady*, a question we do not reach, there is no *Brady* violation when the accused or his counsel knows *before trial* about the allegedly exculpatory information . . . .") (quoting *United States v. Cravero*, 545 F.2d 406, 420 (5th Cir. 1977)).

At issue in this claim are Petitioner's personal records, including his school records, his commendations for thwarting a robbery and assault while he worked as a security guard, evidence of his low birth weight, letters from Petitioner's mother evidencing a close relationship, a childhood photograph of Petitioner's Catholic confirmation, his parents' wedding certificate evidencing an 18-year difference in age, his mother's death certificate indicating that Morgan had ended their relationship on the anniversary of Petitioner's mother's death, and his own wedding certificate. Petitioner does not assert that he was unaware of the existence of this material. Rather, much of this evidence was located in a grey lock box that had been specifically identified in a search warrant and stored at the Sanford Police Department where defense counsel had access to it. (Ex. F-13 at 124-125, 29-30; Ex. A-1 at 19.) Petitioner was aware that the lock box had been taken and repeatedly informed counsel in letters of the box's contents and indicated that he knew of every item in the box. (Ex. F-4 at 588, 592, 596.) Moreover, Petitioner certainly was aware of the existence of his own school records. *LeCroy v. Sec'y, Fl. Dep't. of Corr.*, 421 F.3d 1237 (11th Cir. 2005) (no *Brady* violation when defense could have obtained the defendant's school

and medical records by exercising reasonable diligence).  There was no suppression of evidence.  Accordingly, Petitioner's *Brady* claim is without merit, and the state court's adjudication of this claim did not involve an unreasonable application of *Brady*.

### 2.     *Giglio*

Petitioner alleges that the State knowingly presented false information when it allowed Dr. Reibsame, the State's mental health expert, to falsely testify that Petitioner was "a pretty bright guy who did well in school, except for some problems in math, and left school in the 11th grade because he transferred to a public school where he was afraid of violence".  Petitioner contends this testimony was false because he actually failed almost all of his subjects and never went to public school.  (Doc. No. 1 at 25.)  Petitioner argues that the testimony benefitted the State because it undermined Petitioner's claim of brain damage and mental illness (Doc. No. 1 at 25).

Petitioner raised this claim in his Rule 3.851 motion, and the post-conviction court denied the claim.  On appeal, the Supreme Court of Florida affirmed the trial court.  *Lynch*, 2 So. 3d at 83-84.   The Supreme Court of Florida identified *Giglio* as providing the governing legal principles of this claim and articulated the elements of a *Giglio* claim.  The court determined that Dr. Riebsame's testimony was not false and that Petitioner could not demonstrate that Dr. Riebsame's inaccurate testimony was material:

> Lynch also contends that the prosecutor knew of the falsity of Dr. Riebsame's testimony because he had Lynch's school records in his case file during the penalty-phase proceedings, and that the prosecutor failed to correct Dr. Riebsame.  However, even if this assertion is accurate, Lynch cannot establish that he suffered any prejudice.  "Under *Giglio*, false

74

testimony is material if there is a reasonable possibility" that it could have affected the judgment of the fact-finder. *See Guzman v. State*, 941 So. 2d 1045, 1049-50 (Fla. 2006); *Guzman v. State*, 868 So. 2d 498, 507-08 (Fla. 2003). First, Lynch knew that he had failed several courses during the eleventh grade and he chose not to alert his trial counsel, or the court, that Dr. Riebsame's testimony was "false." Hence, if the prosecutor failed to correct false testimony, Lynch was complicit in this alleged falsification effort. Second, Lynch's post-conviction mental-health experts testified that his school records corroborated their belief that Lynch suffers from a "mild cognitive impairment." (Emphasis supplied.) Lynch did not have a prior history of diagnosed mental illness, is of average overall intelligence (IQ of 101-111), and meticulously planned and executed the murder portion of his murder-suicide plot. Therefore, it is unlikely that revelations of low performance in algebra and mechanical drawing during his junior year of high school during the late 1960s, and information related to poor performance on standardized tests, would have altered the fact-finder's determination that Lynch did not qualify for the statutory mental-health mitigators. The facts of this case simply do not support Lynch's contention that his mild cognitive impairment was material.

*Id.* at 84. The record and applicable law support the Supreme Court of Florida's conclusion.

Under *Giglio*, the knowing use of material false evidence by the prosecution violates due process. 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959). This rule applies whether the prosecution actually solicited the perjured testimony or whether the prosecution permits the testimony to stand uncorrected after learning of its falsity. *Giglio,* 405 U.S. at 153; *Napue*, 360 U.S. at 269. To establish a *Giglio* violation, a defendant must demonstrate that the testimony was false, that the state knew the testimony was false, and that the false testimony was material, *i.e.*, there was a reasonable likelihood that the false testimony could have affected the judgment of the jury. *De Marco v. United States*, 928 F.2d 1074 (11th Cir. 1991).

Petitioner asserts that the State knew, or should have known, that Dr. Riebsame

testified falsely during the penalty phase when he stated that Petitioner had done well in

school except for math and had left school in 11th grade because he was afraid of the public

school's violence.  However, Dr. Riebsame did not testify to those facts.  Rather, he testified

that Petitioner had *told* him those things:

> [STATE].    Did [Petitioner] talk to you about his schooling, about being in
> Catholic school, transferring to public school?
>
> A.    Yes.  He indicated that he had been in Catholic school and
> done well through the tenth grade.  He had some behavior
> problems in grammar school, described the nuns as being
> strict, but there was no repeated grades, no diagnosis of any
> kind of learning disorder.  He admitted being somewhat slow
> in math, but he was able to pass his classes, but he dropped out
> of school around the eleventh grade when he was enrolled in
> public school at the time.
>
> Q.    Did he relate to you what public school that was and whether
> it was maybe a very rough part of Brooklyn, or anything like
> that, do you know anything about that?
>
> A.    He didn't identify the exact public school.  He did indicate that
> there was a great deal of violence in the school setting,
> according to Mr. Lynch, that he was fearful there.  This was
> also at a time when his father had just passed away, so he
> made a decision to leave school and to, according to his report,
> begin to look for a job to support himself.

(Ex. A-8 at 926-927).  Clearly, Dr. Riebsame did not testify falsely.  He merely repeated

what Petitioner had told him.  Accordingly, the Supreme Court of Florida's determination

that Dr. Riebsame's testimony was not false, as he couched his evaluation in terms of what

Petitioner self-reported, was not an unreasonable determination of the facts in light of the

evidence presented in the state court proceeding.

Moreover, Petitioner was aware that Dr. Riebsame's testimony regarding his education was inaccurate and failed to alert his counsel or to object. There is no violation of due process resulting from prosecutorial non-disclosure of false testimony if the defense is aware of it and fails to object. *Routly v. Singletary*, 33 F.3d 1279, 1286 (11th Cir. 1994); *United States v. Minster*, 619 F.2d 1041 (1045-46) (4th Cir. 1980) (if defense is aware of falsity of testimony, it waives objection to inaccurate testimony by waiting until after trial to bring the question to the attention of the trial judge); *Evans v. United States*, 408 F.2d 369, 370 (7th Cir. 1969) ("When a criminal defendant, during his trial, has reason to believe that perjured testimony was employed by the prosecution, he must impeach the testimony at the trial, and 'cannot have it both ways. He cannot withhold the evidence, gambling on an acquittal without it, and then later, after the gamble fails, present such withheld evidence in a subsequent proceeding[.]"). Thus, the defense waived any *Giglio* claim by failing to raise it during the penalty proceeding. The Supreme Court of Florida's adjudication of this claim did not involve an unreasonable application of *Giglio*. Accordingly, this claim is denied pursuant to Section 2254(d).

### E.    Claim Five

Petitioner asserts that counsel rendered ineffective assistance during the guilt phase of his trial. In support of this claim, Petitioner maintains that counsel performed deficiently for a variety of reasons and thereby unreasonably advised him to enter a guilty plea based on counsels' lack of understanding of the law and facts. Specifically, Petitioner argues that counsel offered an inadequate factual basis for the armed burglary, first-degree murder,

77

and kidnapping charges and misstated the law of burglary.  Petitioner further contends

that counsel was ineffective for failing (1) to advise him of the defense of consensual entry

to the offense of burglary, (2) to advise him that lack of intent is a defense to first-degree

murder, (3) to advise him of a defense to the kidnapping charge, (4) to consult with a

firearms expert concerning accidental discharge, (5) to advise him of his Fourth

Amendment right to object to the introduction of the evidence seized at his home

(specifically the murder-suicide letter) and to advise him that the search warrant was over-

broad, and (6) to advise him about the marital communication privilege regarding the

murder-suicide letter.  As a result of counsels' failure to investigate and advise him of these

matters, Petitioner argues that his plea was not voluntary.

Petitioner raised these claims in his Rule 3.851 motion.  The state court denied the

claims, and the Supreme Court of Florida affirmed.  *Lynch,* 2 So. 3d at 56-70.  In denying

relief, the Supreme Court of Florida initially noted the following:

> Based on the nature of the crimes Lynch committed, and the fact that
> he confessed on at least three occasions, trial counsel believed that this was
> purely a sentencing case.  Therefore, lead trial counsel, James E. Figgatt, in
> conjunction with co-counsel, Timothy Caudill, made a strategic decision to
> recommend that Lynch plead guilty and concentrate on mitigating his
> culpability for these offenses during the ensuing penalty phase.  Counsel
> were particularly concerned with exposing Lynch to a jury because this case
> involved a thoroughly planned double murder of a mother and her
> thirteen-year-old minor daughter (although the murder of the daughter was
> an unintended, felony murder).  During the postconviction hearing, Mr.
> Figgatt testified that he reviewed the indictment for defects and that he
> discussed possible defenses with Lynch before he pled guilty.  Second-chair
> trial counsel, Mr. Caudill, did not believe that the facts of this case reasonably
> supported any theoretical defenses because Lynch had confessed to his
> actions during (1) a thirty- to forty-minute recorded conversation with a 911

> dispatcher, (2) a discussion with a police negotiator, and (3) a videotaped
> confession (although Lynch characterized the murders as "accidental").  In
> Caudill's mind, the facts of this case were wholly inconsistent with accidental
> discharge, Lynch's actions supported a kidnapping charge, and the
> testimony of a neighbor-who lived directly across the hall from the
> victims-was extremely damaging to any burglary defense.

*Id.* at 57-58.  The Supreme Court of Florida considered each of Petitioner's contentions and

concluded in light of the overwhelming evidence of Petitioner's guilt, counsel made a

reasonable strategic decision to advise Petitioner to enter a plea of guilty so as to

concentrate on presenting compelling mitigation evidence as the best means to avoid a

death sentence.  *Id.* at 57.

With respect to the sufficiency of the factual basis provided by defense counsel, the

court further determined that the factual basis was sufficient for the first-degree murder

charges, and Petitioner and counsel knew that the facts supported convictions for the

remaining offenses such that prejudice was not established.  *Id.* at 63.  As discussed

hereinafter, Petitioner has failed to establish by clear and convincing evidence that the state

court's findings of fact are unreasonable or that the state court's denial of these claims are

either contrary to, or an unreasonable application of, clearly established federal law.

Petitioner first contends that counsel rendered ineffective assistance during the guilt

phase by providing an inadequate factual basis for the charges, which demonstrates that

counsel did not properly advise Petitioner concerning the offenses prior to the plea.  In

pertinent part, defense counsel provided the following factual basis for Petitioner's plea:

> [Petitioner] went to [Roseanna Morgan's] new home spelled out in the count
> related to the burglary, he approached her daughter [Leah Caday] who was

coming home from school, he gained entry voluntarily into the home at that point in time.  Subsequently removed from a bag that he had, one or two or three firearms.  And at that point in time the kidnapping ensues, as well as what we contend or what the State contends and we admit was, in essence, a burglary, because whatever consent he had to be there was gone.

Subsequently, Ms. Morgan, the victim in Count One, arrived at her apartment, her home.  She was met at the door, we believe either by her daughter or by [Petitioner]. . ., she had a heated discussion with [Petitioner],. . . and refused to come into the apartment with him there.

[B]ased upon what [Petitioner] . . . related to the police shortly thereafter, as well as the physical evidence, . . . [Ms. Morgan] was shot on her front stoop or porch area in front of the apartment, and then pulled inside. . . .

* * *

[Petitioner] shot [Morgan] with more than one of the guns that he brought.  And during one of those times, and I'm not sure if it was two or three times, that they were still having this heated exchange back and forth, Ms. Caday either went to her mother or attempted to leave and got in the way of the shooting and she was shot one time and she died.

* * *

While [Petitioner] was there he called the Sanford Police Department or 911 and got the Sanford Police Department dispatcher, who remained on the line with him from thirty-five to forty-five minutes.  There is no issue of fact. . . .

(Ex. A-2 at 379-80.)

Rule 3.172(a) of the Florida Rules of Criminal Procedure provides:

**Voluntariness; Factual Basis.** Before accepting a plea of guilty or nolo contendere, the trial judge shall determine that the plea is voluntarily entered and that a factual basis for the plea exists.  Counsel for the prosecution and the defense shall assist the trial judge in this function.

Fla. R. Crim. P. 3.172(a).  Florida courts have noted that "[t]he purpose of the factual basis

is to avoid a defendant mistakenly pleading to the wrong offense.  To preclude this possibility, the trial judge has considerable discretion to determine whether there is a factual basis for a plea." *Blackwood v. State*, 648 So. 2d 294, 295 (Fla. 3d DCA 1995) (quoting *Suarez v. State*, 616 So. 2d 1067, 1068 (Fla. 3d DCA 1993), citing *Williams v. State*, 316 So. 2d 267 (Fla. 1975)).  If the state court "file contains substantiation of the factual basis, the [state trial] court may deny [a post-conviction] motion by attaching those documents to the order of denial.  Depositions or police affidavits have been determined to fulfill this obligation." *Farran v. State*, 694 So. 2d 877, 878 (Fla. 2d DCA 1997) (citing *Washington v. State*, 688 So. 2d 416, n.2 (Fla. 2d DCA 1997)).  Moreover, in Florida, "[i]n order to withdraw a guilty plea after sentence for lack of factual basis, a defendant must show prejudice or manifest injustice." *Blackwood,* 648 So. 2d at 295 (quoting *Suarez*, 616 So. 2d at 1068, citing *Williams*, 316 So. 2d at 275, and *Grant v. State*, 316 So. 2d 282 (Fla. 1975)) (emphasis omitted).

"Only when a defendant proclaims his innocence while pleading guilty have federal courts required a judicial finding of some factual basis for the plea as an essential part of the constitutionally required finding that the plea was voluntary." *Wallace v. Turner*,  695 F.2d 545, 548 (11th Cir. 1982) (citing *North Carolina v. Alford*, 400 U.S. 25, 38 n. 10 (1970)); *see also Meyers v. Gillis*, 93 F.3d 1147, 1151 (3rd Cir. 1996) ("Put simply, the Due Process Clause of the Fourteenth Amendment to the United States Constitution does not require an on-the-record development of the factual basis supporting a guilty plea before entry of the plea, and the failure of a state court to elicit a factual basis before accepting a guilty plea does not in itself provide a ground for habeas corpus relief under 28 U.S.C. § 2254.").

Concerning the voluntariness of a plea, the Eleventh Circuit has explained:

> Once a plea of guilty has been entered, nonjurisdictional challenges to the conviction's constitutionality are waived, and only an attack on the voluntary and knowing nature of the plea can be sustained. *McMann v. Richardson*, 397 U.S. 759, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970); *Bradbury v. Wainwright*, 658 F.2d 1083, 1087 (5th Cir. 1981). The guilty plea cannot have been knowing and voluntary, however, if a defendant does not receive reasonably effective assistance of counsel in connection with the decision to plead guilty, because the plea does not then represent an informed choice. *Mason v. Balcom*, 531 F.2d 717, 724-25 (5th Cir. 1976). Counsel must be familiar with the facts and the law in order to advise the defendant of the options available. *Bradbury v. Wainwright*, 658 F.2d 1083, 1087 (5th Cir. 1981); *Calloway v. Powell*, 393 F.2d 886, 888 (5th Cir. 1968). The guilty plea does not relieve counsel of the responsibility to investigate potential defenses so that the defendant can make an informed decision. *Lee v. Hopper*, 499 F.2d 456, 463 (5th Cir.), *cert. denied*, 419 U.S. 1053, 95 S. Ct. 633, 42 L. Ed. 2d 650 (1974). Counsel's advice need not be errorless, and need not involve every conceivable defense, no matter how peripheral to the normal focus of counsel's inquiry, but it must be within the realm of competence demanded of attorneys representing criminal defendants. *Tollett v. Henderson*, 411 U.S. 258, 93 S. Ct. 1602, 36 L. Ed. 2d 235 (1973); *McMann v. Richardson*, 397 U.S. 759, 771, 90 S. Ct. 1441, 1449, 25 L. Ed.2d 763 (1970).

*Scott v. Wainwright*, 698 F.2d 427, 429 (11 Cir. 1983)

With these principles in mind, the Court will consider the adequacy of the factual basis in subparts (1) through (3) and Petitioner's remaining contentions of ineffective assistance of counsel in the guilt phase, as well as, the voluntariness of the plea in light of counsels' performance.

### 1.    *Consensual Entry*

Petitioner alleges that counsel rendered ineffective assistance by failing to advise him of the defense of consensual entry to the offense of armed burglary. Petitioner maintains that the factual basis provided for the plea demonstrates that Leah Caday

voluntarily allowed him to enter the apartment, and thus, he could not be guilty of armed burglary.

In considering this claim, the Supreme Court of Florida recognized that the burglary law at the time of the offense prohibited a burglary conviction when the defendant had consent to enter the home and did not surreptitiously remain in the home. *Lynch*, 2 So. 3d at 61. As such, the court determined that counsel misapprehended the law regarding burglary and the facts offered by counsel during the plea colloquy would not have supported a burglary conviction because counsel indicated that Petitioner entered the apartment with the consent of Leah Caday. *Id*. Nevertheless, the court concluded that any deficiency concerning the factual basis for the armed burglary offense or counsel's misapprehension concerning Petitioner's initial entry into the apartment did not result in prejudice. *Id*. The court reasoned:

> [T]rial counsel and Lynch were well aware that he exited the apartment and thereafter sought a non-consensual reentry after having wounded Morgan with three shots from the Glock G30. "Lynch knocked on the door to Morgan's apartment and said [to Caday], 'Hurry up, open the door, your mom is hurt.'" *Lynch*, 841 So. 2d at 371 (emphasis supplied). Consent to enter induced through fraud or deceit is illusory as a matter of law, and we conclude that the same rationale applies to consent induced through coercion or implied threat of force. *Cf., e.g., Andrews v. State*, 973 So. 2d 1280, 1283 (Fla. 4th DCA 2008) (holding that consent obtained through fraud or deceit (*i.e.*, false pretense) is a legal nullity). Lynch compelled a minor to open the door of her apartment by shooting her mother and then using her mother's injuries to gain access to the dwelling with the intent to commit an offense therein (*i.e.*, the murder of Roseanna Morgan). This is not a consensual entry. Lynch and his trial counsel knew that the State possessed facts sufficient to establish burglary. Therefore, the facts of this case reveal that any prejudice Lynch alleges that he may have suffered from his counsel's off-the-cuff factual proffer would not have altered his decision to plead guilty to the

offense of armed burglary.

*Id*. at 61-62.

Petitioner has not shown that the state court's determination that he failed to demonstrate prejudice was unreasonable. In Florida, "[b]urglary means entering or remaining in a dwelling, a structure, or a conveyance with the intent to commit an offense therein, unless . . . the defendant is licensed or *invited to enter or remain*." Fla. Stat. § 810.02(1) (1999) (emphasis added). "[E]ntrance gained by trick or fraud will support a conviction for burglary." *Gordon v. State*, 745 So. 2d 1016, 1018 (Fla. 4th DCA 1999).

The record reflects that the trial court read the charges in the indictment at the plea hearing, and Petitioner affirmed that he understood the charges. Moreover, as the state court reasoned, the evidence presented during the penalty phase included the testimony of Yahira Morales, the victims' neighbor. Morales testified that she observed Petitioner knock on the door of Morgan's apartment and heard him say "hurry up, open the door, your mom is hurt." (Ex. A-4 at 62.) At that time, Petitioner was dragging Morgan, who was bloody from the waist down and screaming for help. *Id*. at 61-62. Morales subsequently saw the door open, saw Petitioner drag Morgan into the apartment, and then heard three additional gun shots about five minutes after the door closed. *Id*. at 63. The prosecution prepared a factual basis, which was filed in the court on the day of the plea and which included Morales' observations. (Ex. A-2 at 279-84; 367-69.) However, defense counsel did not want to use the prosecution's factual basis because they thought it could be used to prove some of the aggravating factors at sentencing. *Id*. at 377-78. As such,

defense counsel provided a quickly improvised factual basis that did not include the detail contained in the prosecution's factual basis.

Nevertheless, the record contained evidence to substantiate the factual basis for the plea. Under Florida law, the evidence, as noted in the prosecution's factual basis and as presented at the penalty phase, was sufficient for a burglary conviction. Petitioner clearly tricked Caday into allowing him to enter the apartment by telling her that her mother was hurt, so as to deceive Caday into opening the door in order for them to help Morgan. However, instead of helping Morgan once they entered the apartment, Petitioner killed her. Thus, the evidence known to counsel and Petitioner and included in the State's factual basis clearly supported a burglary conviction under Florida law.

Moreover, Petitioner's letter to counsel demonstrates that he agreed that the evidence of his guilt of the offenses was more than sufficient to support convictions. On March 14, 2000, in expressing his frustration with the State, Petitioner wrote:

> They don't know or could give a hoot or hell about Roseanna or Leah until I dropped this in their laps all wrapped up with ribbons and bows so even a chimp in the zoo could prosecute successfully.
>
> * * *
>
> With all the nice neat help I gave them, like the note and audiotapes, they don't have to be Joe Friday or Sherlock Holmes to prosecute this case.

(Ex. F-4 at 589, 591.)

Given that the evidence established Petitioner did not have consent to enter the apartment under Florida law, that the factual basis offered by the prosecution included the

pertinent facts, and given Petitioner's statements regarding the extent of the evidence against him, the Court concludes that Petitioner has not established that the state court's denial of this claim is contrary to, or an unreasonable application of, *Strickland* or *Hill*.   In other words, Petitioner has not shown that if counsel had advised him that consent to enter was a defense to burglary, he would not have entered a plea but would have proceeded to trial.   Accordingly, giving the state court's determination due deference, this claim is denied pursuant to Section 2254(d).

　　　　2.   *Lack of Intent*

　　　　Petitioner next asserts that counsel failed to advise him that lack of intent is a defense to first-degree murder.   In support of this claim, Petitioner relies on counsel's statements in the factual basis that he and Morgan were "having a heated discussion" when he shot her and that Caday "got in the way of the shooting and she was shot. . . ." (Doc. No. 1 at 30.)

　　　　Petitioner raised this claim in his Rule 3.851 motion, and the state post-conviction court denied relief.   The Supreme Court of Florida affirmed the lower court.   *Lynch*, 2 So. 3d at 58-60, 68-69.   The court first determined that counsel did not render deficient performance in relation to the factual basis for the first-degree murder convictions because the factual basis contained sufficient factual support for the offenses.   *Id.* at 58-59.   The court noted that the factual basis given by defense counsel indicated Petitioner arrived at the victims' apartment, held Caday hostage, and then shot and killed both of them when Morgan arrived at the apartment.   *Id*.   The court stated that Petitioner's "killing of Morgan

86

was an intentional, premeditated first-degree murder, and his killing of Caday was both first-degree felony murder and first-degree murder under the doctrine of transferred intent." *Id.* The court further reasoned that Petitioner failed to demonstrate that he was prejudiced because he and counsel knew that "the State possessed the necessary evidence to prove his commission of these murders." *Id.* The court cataloged the extensive evidence that was presented to support the first-degree murder convictions, which included (1) the murder-suicide letter, (2) evidence that Petitioner took three firearms to the victims' apartment, (3) evidence that Petitioner hid his vehicle to prevent the victims from seeing it, (4) evidence that Petitioner held Caday hostage for approximately thirty minutes while waiting for Morgan, (5) evidence that Petitioner shot Morgan five times (four times with the Glock G30 and once execution style with another firearm); and (6) evidence that Petitioner shot Caday while in the process of murdering Morgan. *Id.* at 59 (citing *Lynch*, 841 So. 2d at 366-79). The Supreme Court of Florida concluded that counsel and Petitioner "were well aware of the wealth of evidence supporting the allegations that Lynch committed two first-degree murders" and Petitioner could not demonstrate that a reasonable probability existed that he would not have entered a plea to the offenses. *Id.*

Petitioner has not demonstrated that the state court's denial of this claim is contrary to, or an unreasonable application of, *Strickland* or *Hill*. As an initial matter, the Court notes that prior to his plea, Petitioner maintained that the shootings were accidental. At the plea hearing, however, the trial court read the charges to Petitioner from the indictment, which stated that the murders of Morgan and Caday were *premeditated*. (Ex. A-2 at 375-76.)

Petitioner affirmed that he understood the charges against him. *Id*. at 376. Thus, before Petitioner entered his plea, he affirmed that he understood that he was charged with, and was entering a plea to, killing Morgan and Caday after deciding to do so. Petitioner's representations constitute "a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977). By affirming that he understood that he was charged with premeditated murder, Petitioner logically should have known that lack of intent to kill would serve as a defense to the charges.

More importantly, the evidence presented during the penalty phase, and noted in the State's factual basis, demonstrates that Petitioner drove to the victims' apartment, hid his vehicle, took three firearms to the apartment, held Caday at threat of gunpoint for more than thirty minutes, shot Morgan outside the apartment in her legs, dragged Morgan inside the apartment, shot Caday in the back, and retrieved another firearm and shot Morgan in the back of the head, execution style.[14] (Ex. A-2 at 279-84.) Petitioner also wrote a letter two days before the incident, wherein he expressed his intent to get even with Morgan. In

---

[14]Interestingly, although Petitioner maintained that the shootings were accidental, the Court notes that during the 911-call, Petitioner provided varying accounts as to why he fired the shots that killed Caday and Morgan. Initially, Petitioner asserted that he panicked when the victims started to scream. (Ex. A-4 at 125-26.) Petitioner then said that he shot Morgan in a fit of rage because he was afraid she was not going to pay the credit card bills. *Id*. at 144. Petitioner later told the 911-dispatcher that he shot the firearm in panic because he thought he saw the police coming into the apartment and the gun "just went off." *Id*. at 148. Petitioner then said the shooting "was a combination of going off accidentally and panic, and I guess you could say it was . . . [Morgan] was being very cold. . . ." *Id*. at 158. Later, Petitioner said that he did not intend to hurt Morgan but he "thought [her] husband was coming up the stairs and . . . had a gun." *Id*. at 164.

light of the overwhelming evidence that Petitioner intended to kill Morgan and shot Caday

during the course of a felony or while intending to shoot Morgan, coupled with Petitioner's

representations to the trial court, Petitioner has failed to establish either deficient

performance or prejudice based on counsels' failure to advise him that lack of intent was

a defense to first-degree murder.   Likewise, Petitioner has not established that counsel

rendered deficient performance regarding the factual basis provided for the offenses of

first-degree murder or that prejudice resulted therefrom.   The state court's denial of this

claim was not an objectively unreasonable application of clearly established federal law,

and the claim is denied pursuant to Section 2254(d).

### 3.     *Kidnapping*

Petitioner contends that counsel rendered ineffective assistance by failing to advise

him about a defense to the kidnapping charge.  (Doc. No. 1 at 28.)  In support of this claim,

Petitioner asserts that he did not move Caday out of or within the apartment and thus,

under Florida law he had a legal defense to the kidnapping charge.  *Id.* at 29.

Petitioner raised this claim in his Rule 3.851 motion, and the state post-conviction

court denied relief.   The Supreme Court of Florida affirmed the lower court, concluding

that Petitioner failed to demonstrate prejudice.  *Lynch*, 2 So. 3d at 62.  The court reasoned:

> Here, Lynch maintains that his confinement of Caday was wholly
> incidental to the murders of Caday and Morgan.   This assertion is
> inconsistent with the facts of this case.   Lynch approached Caday and lured
> her into her apartment by stating that he wished to speak with her mother.
> Once inside, Lynch withdrew a number of firearms from his bag, and he has
> subsequently admitted that (1) Caday was aware of the firearms, (2) he
> "technically" held Caday hostage, (3) she was "terrified," and (4) she only

complied with his demands based on fear.  Under the three-part *Faison*[15] test and the hostage exception from *Mobley*,[16] Lynch committed a kidnapping on March 5, 1999.  First, his movement of Caday was not inconsequential.  He wanted access to Caday's apartment to kill her mother, Roseanna Morgan, and he lured Caday there by stating that he wanted to speak to Morgan.  Second, Lynch's kidnapping and confinement of Caday was not inherent in his intentional murder of Morgan and his erstwhile unintentional killing of Caday.  Lynch could have killed Morgan without ever holding Caday hostage, as evidenced by his frequent trips to Morgan's place of business prior to the events of March 5, 1999, and Lynch did not intend to kill Caday.  Third and finally, Lynch's kidnapping of Caday made his murder of Morgan "substantially easier . . . [and] substantially lessen[ed] the risk of detection," because Caday otherwise could have warned her mother or notified neighbors and law enforcement that an armed man was stationed in her apartment waiting for her mother to return home.  *Faison*, 426 So. 2d at 965; *Berry*, 668 So. 2d at 969.  Trial counsel and Lynch were well aware that the facts of this case supported a kidnapping charge and conviction.  Therefore, any prejudice Lynch allegedly suffered from his counsel's factual proffer was de minimis and would not have altered his decision to plead guilty to the offense of kidnapping.

*Lynch,* 2 So. 3d at 62.

Petitioner has not demonstrated that the state court's denial of this claim is contrary to, or an unreasonable application of, *Strickland* or *Hill.*  As found by the state court, the record included substantial evidence, noted in the State's factual basis, to support the kidnapping conviction under state law.  The Supreme Court of Florida has construed the Florida kidnapping statute, Section 787.01(1)(a)(2), Florida Statutes, to preclude a conviction for "unlawful confinements or movements that were merely incidental to other felonies, but recognized an exception in the case of hostages."  *Faison*, 426 So. 2d at 966

---

[15]*Faison v. State,* 426 So. 2d 963 (Fla. 1983).

[16]*Mobley v. State*, 409 So. 2d 1031 (Fla. 1982).

(citing *Mobley*, 409 So. 2d 1031).

The evidence derived from Petitioner's statements during the 911-call and to the police establish that Petitioner admitted that (1) he had approached Morgan at her place of employment prior to the offenses, (2) he gained entry into the apartment through Caday, (3) he showed Caday his firearms and she was terrified, and (4) he effectively held Caday hostage to reach Morgan, after which he murdered her.  The prosecution's factual basis included Petitioner's statement to police that when Morgan came home, "I was holding the gun and I was trying, we, we were talking there for some time with the door wide open and I said look, I said shut the door, *I'll let Leah go* and I'll even, you know, I . . . I says I'll put the gun down, if you want. . . ."  (Ex. A-2 at 283) (emphasis added).

Thus, the evidence, as noted in the prosecution's factual basis and as presented at the penalty phase, was sufficient for a kidnapping conviction under Florida law. Furthermore, counsel knew of Petitioner's statements to the 911-dispatcher, the police negotiator, and to the police, wherein he admitted he had held Caday, who was in fear, as a hostage in order to get to Morgan.  As such, Petitioner has not shown that if counsel had advised him that his failure move Caday out of or within the apartment was a defense to kidnapping, he would not have entered a plea but would have proceeded to trial. Likewise, Petitioner has not established that a reasonable probability exists that he would not have entered a plea to kidnapping absent counsel's abbreviated factual basis because the factual basis was given to prevent the prosecution from using its own factual basis. Accordingly, giving the state court's determination due deference, this claim is denied

pursuant to Section 2254(d).

### 4.    *Firearms Expert*

Petitioner contends that counsel rendered ineffective assistance by failing to consult a firearms expert to explain that it was possible for a gun to misfire or repeatedly fire without the shooter intending to kill.  (Doc. No. 1 at 30.)  Petitioner maintains that a firearms expert would have explained that the evidence was consistent with second degree murder.  *Id.*

Petitioner raised this claim in his Rule 3.851 motion, and the post-conviction court denied relief.  The Supreme Court of Florida determined that counsel made a strategic decision not to pursue an accidental discharge defense:

> The evidence presented during both the penalty phase and postconviction proceedings is clearly inconsistent with an accidental-discharge defense.  Consequently, as a matter of sound strategy, trial counsel elected not to waste finite time and resources preparing such a defense.  "[T]rial counsel cannot be deemed ineffective for failing to raise an issue that, as illustrated in the evidentiary hearing testimony, *is clearly unsupported by the record.*"  *Power v. State*, 886 So. 2d 952, 959 (Fla. 2004) (emphasis supplied).

*Lynch*, 2 So. 3d at 68.  The court further concluded that "[t]he strategic decision of trial counsel not to pursue an accidental-discharge defense did not affect Lynch's election to plead guilty because the facts of this case are simply inconsistent with accidental discharge."  *Id.* at 70.

As discussed *supra* in claim one, trial counsels' testimony supports the finding that counsel made a strategic decision to forego an accidental discharge defense.  At the

evidentiary hearing, Figgatt testified that he had not investigated the theory of a misfiring Glock because more than one gun was used in the murders and the Glock is not an automatic pistol. (Ex. F-13 at 91, 94.) Figgatt believed that he could not make a credible argument that Petitioner accidentally pulled the trigger seven separate times. (Ex. F-15 at 406-08.) Caudill also testified that he believed that nothing would have been gained by presenting an accidental discharge defense because, under the theories of felony murder and transferred intent, Petitioner still would have been guilty of first-degree murder. (Ex. F-18 at 1111-12.)

The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and the state court's decision concerning that issue is presumptively correct. *Provenzano*, 148 F.3d at 1330. The record supports the state court's determination that counsel made a reasonable strategic decision to forego an accidental discharge defense. Petitioner took three firearms to the victims' apartment. Petitioner clearly was knowledgeable about firearms. In fact, on the date of the offenses, Petitioner told the 911-dispatcher that the Glock did not have a safety and only had a five pound trigger pressure. (Ex. A-4 at 137-38.) Petitioner further noted that the Tampa Police Department had experienced several accidental discharges with the Glock because of its sensitive trigger. *Id.* 177. Petitioner also told the 911–dispatcher that he unloaded the Glock at one point. *Id*. at 165. Despite knowing about these purported problems with the Glock, Petitioner chose to carry this firearm into the apartment and to reload the Glock, which strongly suggests that he was not concerned that the Glock might "accidentally

discharge." Moreover, Petitioner did not fire the Glock only one time, but multiple times, and he shot Morgan more than once with the firearm. That the repeated firing of the Glock was not accidental is further evidenced by the fact that Petitioner retrieved his .38 caliber firearm and shot Morgan, who was still breathing, in the back of the head. (A-4 at 145.) Petitioner also expressed his intent to get even with Morgan two days prior to the offenses. In sum, based on the evidence, counsel could reasonably have decided not to pursue an accidental discharge defense or consult a firearms expert regarding such defense. As such, the state court's determination that counsel did not render deficient performance by failing to consult a firearms expert or advise Petitioner about such defense is objectively reasonable.

Finally, as discussed *supra*, at the plea hearing, the trial court read the charges to Petitioner from the indictment, which stated that the murders of Morgan and Caday were premeditated. (Ex. A-2 at 375-76.) Petitioner affirmed that he understood the charges against him. *Id*. at 376. Thus, before Petitioner entered his plea, he necessarily understood that he was foregoing any defense that the shootings were accidental because he admitted that the murders were premeditated. Consequently, the Court concludes that Petitioner has failed to demonstrate that a reasonable probability exists that he would not have entered a plea and would have proceeded to trial had counsel consulted a firearms expert or advised him about the defense of accidental discharge. Accordingly, this claim must be denied pursuant to Section 2254(d).

5. **Fourth Amendment and Overbreadth**

94

Petitioner contends that counsel rendered ineffective assistance by failing to advise him of his Fourth Amendment right to object to the introduction of the evidence seized at his home (specifically the murder-suicide letter).  (Doc. No. 1 at 28.)  Petitioner argues that the murder-suicide letter was seized from his home on the date of the offenses without a warrant or the consent of Virginia Lynch.  *Id.* at 30-31.  Petitioner also maintains that counsel rendered ineffective assistance by failing to advise him that the other items seized from his home on March 9, 1999, were subject to suppression because the warrant was over-broad.  (Doc. No. 1 at 32.)

Petitioner raised these claims in his Rule 3.851 motion, and the state post-conviction court denied relief.  As discussed more fully in claim one *supra,* the Supreme Court of Florida affirmed the denial of Petitioner's ineffective assistance of counsel claim premised on the Fourth Amendment.  The court reasoned that Petitioner failed to demonstrate prejudice because the letter was admissible under the "plain view" doctrine.  *Lynch*, 2 So. 3d at 67.  The court held, therefore, that Petitioner's "nonexistent ability to suppress this evidence could not have affected [his] decision to plead guilty."  *Id.* at 68.

This Court concludes that Petitioner has failed to demonstrate that the state court's denial of this claim is contrary to, or an unreasonable application, of clearly established federal law.  As this Court reasoned in claim one, the state court reasonably determined that Virginia Lynch consented to the officer's search of the home she shared with Petitioner and the officer saw her reading the murder-suicide letter in plain view.  Furthermore, the state court reasonably concluded that the incriminating nature of the letter was

95

immediately apparent to the officer because the police were aware of the murder-suicide letter. Thus, under the plain view doctrine, the officer was entitled to seize the letter, and the letter was admissible.

Moreover, the murder-suicide letter was not the only evidence against Petitioner. Counsel was aware that Petitioner had made three separate statements regarding the offenses, wherein he admitted hiding his vehicle from the victims; taking three guns to the victims' apartment; holding Caday at threat of gunpoint as a hostage for more than thirty minutes; shooting Morgan outside the apartment and dragging her inside; shooting Caday in the course of shooting Morgan; and retrieving another firearm and shooting Morgan, who was still alive, execution style in the head. "Counsel's advice need not be errorless, and need not involve every conceivable defense, no matter how peripheral to the normal focus of counsel's inquiry, but it must be within the realm of competence demanded of attorneys representing criminal defendants." *Scott*, 698 F.2d at 429 (citing *Tollett*, 411 U.S. 528). Petitioner has not established that but for counsels' failure to move to suppress the letter or advise him regarding the potential suppression of the letter, a reasonable probability exists that he would not have entered a plea and proceeded to trial. Accordingly, Petitioner has not demonstrated that prejudice resulted from counsel's failure to seek exclusion of the letter. The Supreme Court of Florida's adjudication of this claim was neither contrary to, nor an unreasonable application of, *Strickland* or *Hill*.

With respect to Petitioner's claim that the warrant was overly broad, the Supreme Court of Florida determined that Petitioner failed to demonstrate prejudice based on

counsel's failure to advise him about the warrant. *Lynch*, 2 So. 3d at 67. The court reasoned that the items seized from Petitioner's home via the warrant were never presented at trial nor did the items directly relate to Petitioner's guilt. *Id.* The court determined, therefore, Petitioner could not establish that a reasonable probability existed that he would not have entered a plea but would have proceeded to trial had counsel advised him of, or sought to suppress the evidence, based on the warrant. *Id.* The court noted that its conclusion was supported by the weight of the evidence of Petitioner's guilt, namely that "[o]n at least three separate occasions, Lynch had previously admitted that he killed the victims: (1) a recorded conversation with a 911 dispatcher, (2) a conversation with a police negotiator, and (3) a videotaped interrogation with police investigators." *Id.*

Petitioner has not demonstrated that the state court's denial of this claim is contrary to, or an unreasonable application of, clearly established federal law. The items obtained by the police as a result of the warrant were not admitted into evidence nor did they largely relate to Petitioner's guilt. As such, in light of the evidence of Petitioner's guilt, including his statements to police and others regarding the offenses, Petitioner has not established a reasonable probability exists that he would have proceeded to trial if counsel had advised him of the alleged overbreadth of the warrant or had counsel moved to suppress the items seized. Claim five is therefore denied pursuant to Section 2254(d). *See, e.g., Premo v. Moore*, 131 S. Ct. 733, 744-45 (2011) (concluding that the state court's determination was objectively reasonable that the defendant did not establish a reasonable probability existed that he would not have entered a plea but for counsel's failure to move to suppress his confession

and noting that the state's prosecution of the defendant did not depend on the admission

of the defendant's police confession).

### 6.      *Marital-Communication Privilege*

Petitioner asserts that counsel rendered ineffective assistance by failing to advise

him that the murder-suicide letter was subject to suppression based on the marital

communication privilege.   Petitioner maintains counsels' failure to advise him of this

resulted in his plea being involuntary.  (Doc. No. 1 at 32-34.)

Petitioner raised this claim in his Rule 3.851 motion, and the post-conviction court

denied relief.  In affirming, the Supreme Court of Florida first noted that counsel may have

had a nonfrivolous argument to raise based on the marital communication privilege

regarding the admissibility of the murder-suicide letter, namely that Petitioner did not

intend his wife to distribute the letter based on the content of the letter.  *Lynch*, 2 So. 3d at

64.  Nevertheless, the court determined upon review of the letter that Petitioner "never

intended for this message to constitute a confidential marital communication."  *Id.* at 65.

The court concluded, therefore, under Florida law, that the spousal privilege did not apply

and the letter was admissible.  *Id.*

As discussed more thoroughly in claim one, Petitioner has not shown that the state

courts' factual finding was unreasonable regarding who the intended recipients of the

murder-suicide letter were.  In the murder-suicide letter, Petitioner expressed his desire to

tell Morgan's parents what she had done and the pain she had caused and to explain why

he did what he did.  The January 11th and February 2nd correspondence from Morgan to

Petitioner referenced in the murder-suicide letter consisted solely of expressions of affection before their break-up.  (Ex. F-8 at 1431-34.)  Consequently, the January 11th and February 2nd correspondence did not accomplish Petitioner's stated purpose of providing Morgan's parents "with a sense of why it happened" and an understanding of "what [Morgan] did, [and] the pain she caused."  (Ex. F-1 at 176-79.)  Instead, the murder-suicide letter itself explained Petitioner's justification for his intended actions because it described his and Morgan's relationship and what Morgan had done, such as reconcile with her husband and refuse to pay the credit card bills.  In fact, Petitioner concluded the murder-suicide letter by explicitly noting why Morgan had to pay:

> She built me up, made me love her, loved me, gave me that card on Feb 2, we made love on Feb 6 then on [unintelligible] she ended it.  You cannot tell someone words like that, then expect them to turn off like a switch.  [Then] there's the $ worry.

(Ex. F-1 at 179.)  Thus, the murder-suicide letter, not the January 11th and February 2nd correspondence, accomplished Petitioner's intended purpose of explaining why "it" happened.  It was reasonable, therefore, for the state courts to determine that Florida's marital communication privilege did not apply to the letter because Petitioner intended Virginia Lynch to send the murder-suicide letter to Morgan's parents.  Petitioner has not presented clear and convincing evidence that the state courts' determination was incorrect.

Additionally, as discussed *supra*, the evidence that the murders of Morgan and Caday were murder in the first degree, either because they were premeditated or felony murder or based on the doctrine of transferred intent, was substantial notwithstanding the

99

murder-suicide letter.  Particularly, Petitioner made three separate statements regarding the offenses, wherein he admitted hiding his vehicle from the victims, taking three loaded guns to the victims' apartment, holding Caday hostage for more than thirty minutes, shooting Morgan outside the apartment and dragging her inside, shooting Caday in the course of shooting Morgan, and retrieving another firearm and shooting Morgan execution style in the head.  Petitioner has not established that but for counsels' failure to move to suppress the letter based on the marital communication privilege, a reasonable probability exists that he would not have entered a plea and proceeded to trial.  Accordingly, this subclaim is denied pursuant to Section 2254(d).

Finally, the Court notes that with respect to the voluntariness of the plea, the record reflects that Petitioner affirmed that he understood that the maximum penalty he faced was death. (Ex. A-9 at 1077.)  Likewise, the trial court advised Petitioner of his right to trial and the rights he would forego if he entered a plea, and Petitioner confirmed that he understood.  *Id.*  The trial court further advised Petitioner that he was entitled to challenge the legality of any search and by entering the plea he would be waiving that right.  *Id.* at 1078.  Petitioner affirmed that he understood.  *Id.*  The trial court read the charges alleged in the indictment after which Petitioner said he understood the charges and was guilty of the charges.  *Id.* at 1080-81.  The trial court determined that Petitioner was voluntarily entering a plea to the offenses and accepted the plea.  *Id.* at 1085.

Counsel knew of Petitioner's statements to the 911-dispatcher, the police negotiator, and to the police, wherein he made declarations supporting the offenses charged.  Thus,

although counsel had the responsibility to investigate potential defenses so Petitioner could make an informed decision, counsel did not have to advise Petitioner of every conceivable defense, particularly defenses that were refuted by Petitioner's own statements and other known evidence.  In light of the overwhelming evidence demonstrating Petitioner's guilt of the offenses and his representations to the trial court, the Court concludes that Petitioner has not established that his plea was involuntarily entered or that a reasonable probability exists that he would not have entered a plea had counsel advised him as to all of the aforementioned matters.  Accordingly, claim five is denied pursuant to Section 2254(d).

### F.    Claim Six

Petitioner contends that the Florida death penalty statute is unconstitutional because: (1) the State is not required to provide notice to the defendant as to the aggravating factors it intends to prove; (2) the statute limits the consideration of mitigating evidence, particularly the statutory factors of mental health mitigation; (3) the statute's requirement that the defense prove mitigating factors amounts to an unconstitutional burden shifting; (4) the aggravating factor of heinous, atrocious and cruel is described in a vague manner and has been applied in a vague and inconsistent manner; and (5) the "felony murder" aggravator applied in this case creates an "arbitrary automatic aggravating factor in all felony murders. . . ." (Doc. No. 1 at 36-37).

### 1.    Notice of Aggravating Factors

On direct appeal, Petitioner asserted that Florida's death penalty is unconstitutional because it does not require the State to provide notice of the aggravating factors it intends

to prove at sentencing.  The Supreme Court of Florida held:

> Appellant's first claim-that Florida's death penalty scheme is
> unconstitutional because it fails to provide notice as to aggravating
> circumstances-is rejected based on the ruling of *Vining v. State*, 637 So. 2d 921
> (Fla. 1994).    There this Court wrote: "The aggravating factors to be
> considered in determining the propriety of a death sentence are limited to
> those set out in section 921.141(5), Florida Statutes (1987).  Therefore, there
> is no reason to require the State to notify defendants of the aggravating
> factors that it intends to prove." *Vining*, 637 So. 2d at 928.

*Lynch*, 841 So. 2d at 378.  Petitioner argues that *Gardner*, 430 U.S. at 349 and *Argersinger v.*

*Hamlin*, 407 U.S. 25 (1972), support his claim.

In *Gardner*, the Supreme Court stated that "the sentencing process, as well as the trial

itself, must satisfy the requirements of the Due Process Clause."  430 U.S. at 358.   More

specifically, *Gardner* holds that the constitutional guarantees of due process prohibit a court

from imposing the death penalty based in part on information contained in a pre-sentence

report that is not disclosed to the defendant. *Id.* at 362.  In *Argersinger*, the Supreme Court

held that an accused cannot be subjected to actual imprisonment unless provided with

counsel.  407 U.S. 25.  Nothing in *Gardner* or *Argersinger*, however, even tangentially

establishes or discusses the legal principle that the State must identify the aggravating

factors it intends to prove at sentencing.

Moreover, no Supreme Court case requires the State to provide notice of the

aggravating factors it intends to prove at the penalty phase.  The Supreme Court of

Florida's rejection of this claim, therefore, is not contrary to, or an unreasonable application

of, clearly established federal law. *See Washington v. Crosby*, 324 F.3d 1263, 1265 (11th Cir.

2003) (quoting *McIntyre v. Williams*, 216 F.3d 1254, 1258 (11th Cir. 2000) ("In applying the 'contrary to' prong of AEDPA, we have recognized that where no Supreme Court precedent is on point, 'we cannot say that the state court's conclusion . . . is contrary to clearly established Federal law as determined by the U.S. Supreme Court.'"). Thus, this claim is denied pursuant to Section 2254(d).

### 2.     *Unconstitutional Limitation of Mitigation Evidence*

Petitioner argues that the Florida death penalty statute unconstitutionally limits the consideration of mitigating evidence, particularly the statutory factors of mental mitigation. (Doc. No. 1 at 36.)  Petitioner raised this issue on direct appeal.  The Supreme Court of Florida rejected the claim, noting that *Trease v. State*, 768 So. 2d 1050, 1055 (Fla. 2000), "upheld and clarified Florida's death penalty sentencing scheme as to the consideration of mitigating factors as applied here."  *Lynch*, 841 So. 2d at 378.

Petitioner does not describe the mental health mitigation evidence allegedly limited at his penalty phase or explain how the Florida death penalty statute unconstitutionally limits the consideration of non-statutory mitigation evidence.[17]  Petitioner, however, cites *Lockett v. Ohio*, presumably for the proposition that capital defendants are entitled to present as mitigation evidence "any aspect of a defendant's character or record. . . ." 438 U.S. 586, 604 (1978).

---

[17]Section 921.141(6)(h), Florida Statutes, specifically states that, in addition to the statutory mitigating factors, mitigating circumstances *shall* include "[t]he existence of any other factors in the defendant's background that would mitigate against imposition of the death penalty."  (2000).

The record refutes Petitioner's implied allegation that he was precluded from presenting a complete picture of the relevant mitigating factors to the sentencing court. In its sentencing order, the trial court considered the mental health mitigation evidence presented at the sentencing phase. In relation to mental health mitigation, the court determined that the crime had been committed while the defendant was under the influence of mental or emotional disturbance, but not extreme emotional disturbance; the defendant's capacity to conform his conduct to the requirements of law was impaired, but not substantially impaired; and the defendant suffered from mental illnesses at the time of the offenses. (Ex. A-3 at 514-20.) The sentencing court also considered other non-statutory mitigating circumstances, such as Petitioner's childhood abuse, his history of alcohol abuse, his adjustment to incarceration, his cooperation with police, his gainful employment, and his positive interactions with his children. *Id.* at 515-18. This is not a situation in which the sentencing judge did not consider the evidence; rather, the judge in fact considered Petitioner's mitigating evidence.

While *Lockett* prohibits the sentencer from being precluded from considering mitigating factors, it does not require the sentencer to give *effect* to all of the mitigation presented by the defense. As long as the defense is allowed to present all relevant mitigating evidence and the sentencer is given the opportunity to consider it, there is no constitutional violation. *See Penry v. Lynaugh*, 492 U.S. 302, 328 (1989) (abrogated on other grounds by *Atkins v. Virginia*, 536 U.S. 304 (2002)).

Petitioner has not demonstrated that Florida's death penalty statute

unconstitutionally limits the sentencer's consideration of mitigating evidence. Further, the record clearly refutes any allegation that the sentencing court failed to consider the non-statutory mitigating evidence that was presented during Petitioner's penalty phase. The state court's adjudication of this claim was not contrary to, and did not involve an unreasonable application of, clearly established law and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

### 3.   *Unconstitutional Burden Shifting*

Petitioner alleges that the requirement that the defense prove mitigating factors amounts to unconstitutional burden shifting. (Doc. No. 1 at 36.) Petitioner raised this issue on direct appeal, and the Supreme Court of Florida denied the claim. *Lynch*, 841 So. 2d at 378.

A defendant in Florida is not required to prove any mitigating factors. Rather, the only possible "element" necessary to prove that a defendant convicted of first degree murder is eligible for the death penalty is the application of a single *aggravating* factor. The conclusion that sufficient aggravating factors outweigh the mitigation is not an element of any offense, but simply a relevant sentencing determination. *State v. Steele*, 921 So. 2d 538, 543 (Fla. 2005) ("To obtain a death sentence, the State must prove beyond a reasonable doubt at least one aggravating circumstance, whereas to obtain a life sentence the defendant need not prove any mitigating circumstances at all."). Petitioner has failed to identify any decision of the Supreme Court of the United States that is contrary to the state

court's denial of this claim or to demonstrate that the state court unreasonably applied clearly established federal law.

### 4.     HAC

Petitioner alleges that the Florida death penalty statute is unconstitutional because the HAC aggravating factor is described in a vague manner and has been applied in a vague and inconsistent manner.  (Doc. No. 1 at 36.)  Petitioner raised this issue on direct appeal, and the Supreme Court of Florida denied the claim.  *Lynch*, 841 So. 2d at 378.

The claim that the HAC aggravator in Florida's death penalty statute is unconstitutionally vague was denied in *Proffit v. Florida*, 428 U.S. 242, 255–56 (1976). Therefore, Petitioner's claim that this aggravating factor is unconstitutional on its face is without merit.  *See Marquard v. Sec'y for Dep't. of Corr.*, 429 F.3d 1278, 1315-16 (11th Cir. 2005) (holding that Florida's HAC aggravator is not unconstitutionally vague).  Petitioner has failed to demonstrate that the state court's denial of this claim is contrary to, or an unreasonable application of, clearly established federal law.

### 5.     Felony Murder as an Aggravating Factor

Petitioner argues that Section 921.141(5)(b), Florida Statutes, creates an automatic aggravating factor in all felony murders, resulting in the arbitrary application of the death penalty. (Doc. No. 13 at 80.)  Petitioner raised this issue on direct appeal,  and the Supreme Court of Florida denied the claim.  *Lynch*, 841 So. 2d at 378.

Petitioner's argument that the duplicative nature of the felony murder aggravator renders his sentence unconstitutional was rejected by the Supreme Court in *Blystone v.*

*Pennsylvania*, 494 U.S. 299 (1990).  The *Blystone* Court held that Pennsylvania's sentencing scheme did not amount to an automatic death sentence for one category of defendants—those convicted of felony murder—because the jury was required to weigh any mitigating circumstances against the aggravating circumstances.  *Id*. at 307-08. Florida's death penalty sentencing scheme similarly requires the sentencer to determine whether at least one aggravator exists, and if it does, weigh any aggravator against any mitigating circumstances.  *See Steele*, 921 So. 2d at 545.  The Supreme Court of the United States has upheld Florida's death penalty scheme, including its weighing of aggravating and mitigating factors.  *See Proffitt*, 428 U.S. at 242; *see also Grossman v. Crosby*, 359 F.  Supp. 2d 1233, 1274 (M.D. Fla. 2005) (rejecting identical argument); *Bertolotti v. Dugger*, 883 F.2d 1503, 1528 n. 22 (11th Cir. 1989) (use of felony-murder as an aggravating factor did not make the death penalty automatic under Florida law, so as to render death penalty unconstitutional, although sentencer found in aggravation the circumstance that defendant murdered in the course of robbery).  Petitioner has failed to demonstrate that the state court's denial of this claim is contrary to, or an unreasonable application of, clearly established federal law, and this claim is denied pursuant to Section 2254(d).

### G.    Claim Seven

Petitioner maintains that the waiver of his penalty-phase jury was not knowing and voluntary because he was not informed of his fundamental right to a penalty-phase jury pursuant to *Ring v. Arizona*, 536 U.S. 584 (2002).  Petitioner contends that he raised this claim in his motion for rehearing on direct appeal, but the Supreme Court of Florida did

not address the claim.   (Doc. No. 1 at 38-39.)   Respondents contend that the claim is

procedurally barred from review because it was procedurally defaulted in the state court.

Petitioner does not refute Respondents' contention.   *See* Doc. No. 1 at 38-39; Doc. No. 13 at

74; Doc. No. 23 at 10.

The record establishes that the Supreme Court of Florida noted on direct appeal that

Petitioner could not challenge the constitutionality of Florida's death penalty scheme

pursuant to *Ring* because he waived a penalty-phase jury.   *Lynch*, 841 So. 2d at 366 n. 1.

Petitioner subsequently raised this claim for the first time in a motion for rehearing from

the Supreme Court of Florida's affirmance of Petitioner's convictions and sentences on

direct appeal.   (Ex. D-2.)   The Supreme Court of Florida summarily denied the motion for

rehearing.   (Ex. D-4.)

Florida courts have held that generally issues raised for the first time after a decision

on the merits in a motion for rehearing will not be considered by the court.   *See, e.g.,*

*Fleming v. State,* 82 So. 3d 967, 971 (Fla. 4th DCA 2011) (denying motion for rehearing and

explaining that "if the *Shelton* issue is not raised prior to a decision on the merits, this court

will not consider the issue on a motion for rehearing or motion for rehearing en banc. . . .

Because the issue was not raised prior to a decision on the merits, this court will not take

it into consideration."); *see also Braggs v. State,* 13 So. 3d 505, 507 (Fla. 3d DCA 2009) (noting

the general proscription against the consideration of claims raised for the first time in a

motion for rehearing and distinguishing such claims from corrections of the record).   A

federal court must dismiss those claims or portions of claims that have been denied on

adequate and independent procedural grounds under state law.  *Coleman*, 501 U.S. at 750.

Petitioner failed to raise this claim properly in the state court.  Furthermore, the state court explicitly held that Petitioner could not raise such a claim in light of his waiver. Thus, the claim is procedurally defaulted.  Moreover, Petitioner has failed to demonstrate either cause or prejudice to overcome the procedural default nor has he established that he is actually innocent. Thus, claim seven is procedurally barred.

The Court further notes that Petitioner has not demonstrated that he is entitled to relief on this claim.  At the time Petitioner waived his right to a penalty-phase jury, *Ring* had not been issued.  Thus, neither the trial court nor counsel had a duty to advise Petitioner of a future change in the law before he waived a jury.  *See, e.g., United States v. Ardley*, 273 F.3d 991, 993 (11th Cir. 2001).  Accordingly, the Court concludes that claim seven is procedurally barred and otherwise subject to denial.

### H.    Claim Eight

Petitioner asserts that the trial court's finding of the HAC aggravator with respect to the murder of Leah Caday was not supported by the evidence.  In support of this claim, Petitioner argues that the HAC aggravator should not have been applied because the murder occurred by shooting and Caday died less than one minute after being shot. (Doc. No. 1 at 40-41.)

Petitioner raised this claim on direct appeal.  The Supreme Court of Florida noted that the trial court's finding of the HAC aggravator was premised on the following facts: (1) Petitioner held Leah Caday in the apartment for thirty to forty minutes before her

109

mother arrived, (2) Leah Caday was terrified of Petitioner and his firearm, (3) Leah Caday observed her mother being brutally murdered, and (4) Leah Caday had time to contemplate her impending death. *Lynch,* 841 So. 2d at 369. In denying relief, the court reasoned:

> This Court has consistently held that "fear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel." *James v. State,* 695 So. 2d 1229, 1235 (Fla.1997); *see also Francis v. State,* 808 So. 2d 110, 135 (Fla. 2001); *Farina v. State,* 801 So.2d 44, 53 (Fla. 2001). Moreover, this Court has held "the HAC aggravator focuses on the means and manner in which death is inflicted and the immediate circumstances surrounding the death." *Brown v. State,* 721 So. 2d 274, 277 (Fla. 1998); *see also Card v. State,* 803 So. 2d 613, 625 (Fla. 2001).

> * * *

> In determining whether the HAC factor was present, the focus should be upon the victim's perceptions of the circumstances as opposed to those of the perpetrator. *See Farina,* 801 So. 2d at 53; *see also Hitchcock v. State,* 578 So. 2d 685, 692 (Fla. 1990). Further, "the victim's mental state may be evaluated for purposes of such determination in accordance with a common-sense inference from the circumstances." *Swafford v. State,* 533 So. 2d 270, 277 (Fla. 1988); *see also Chavez v. State,* 832 So. 2d 730, 765-66 (Fla. 2002).

> An examination of the evidence, along with the natural and proper common-sense inferences, establishes that Caday suffered enormous fear, emotional strain, and terror immediately prior to her death. The appellant admitted terrorizing this thirteen-year-old child by holding her hostage at gunpoint prior to shooting her mother and then turning the weapon on her. The appellant himself admitted to the 911 operator, whom he called following the shootings, and to the police in his post-arrest interview, that he held Caday at gunpoint in her home for thirty to forty minutes waiting for Morgan to arrive. Lynch told the 911 operator that "the daughter was just terrified. She says why are you doing this to me." When he spoke to the police negotiator prior to his arrest, Lynch used the term "petrified" to define Caday's emotion at the time of the incident. In his post-arrest interview, Lynch admitted having his firearm in his hand when he told Caday to sit

down inside the apartment. Lynch himself said, "She was afraid." When asked whether he was holding Caday hostage, Lynch replied, "I guess technically in a way of speaking. . . ." The appellant's wife confirmed that when the appellant called her during the time he was holding Caday hostage "[t]here was a lady in the background screaming." Appellant's wife further testified that the screaming woman sounded "very, very upset." Clearly, Caday was terrified during the thirty to forty minutes prior to her death when she was being held hostage by Lynch.

Also significant in this analysis are the events immediately preceding Caday's death after her mother arrived at the apartment. Lynch admitted to the police negotiator that after holding Caday hostage for thirty to forty minutes, Morgan arrived at the apartment, Lynch confronted her and shot her in the leg, then dragged her into the apartment. He admitted the same to the 911 operator: "She had a couple of body hits. . . . I dragged her back inside so I could talk to her." In his post-arrest interview Lynch admitted shooting Morgan several times in front of her daughter, Caday.

Although Lynch maintained that Caday was shot accidentally during the time Lynch fired the initial four to five shots at Morgan before dragging her into the apartment, testimony from other witnesses does not support this assertion. Morgan's neighbor across the hall testified that she looked out of the peephole in her door after hearing the initial shots and saw Lynch dragging Morgan by the hands into the apartment. She further testified that Lynch knocked on the door to Morgan's apartment and said, "Hurry up, open the door, your mom is hurt." The neighbor testified that Morgan was screaming and was bloody from her waist down. Morgan's neighbor further observed the door being opened, Lynch entering and closing the door behind him, and approximately five minutes later hearing three more gunshots. A second neighbor in the apartment complex also testified that approximately five to seven minutes after she heard the initial shots, she heard three more gunshots.

These facts are unlike those of *Rimmer v. State*, 825 So. 2d 304 (Fla. 2002), in which this Court explained that the victims, who had been held hostage for a short time during a robbery and were then killed, had not experienced the type of fear, pain and prolonged suffering necessary to support a finding of HAC. In that case, the facts were insufficient to support that the victims knew they would be killed or were in fear of their impending deaths. *See id.* at 327-29. Here, the evidence unquestionably supports the conclusion that the thirteen-year-old Caday feared for her own life while

being held at gunpoint for thirty to forty minutes, and after witnessing her own mother being shot numerous times, surely experienced terror at the thought of her own impending death.

Lynch was totally indifferent to the suffering he caused Caday. The child undoubtedly witnessed her mother being shot several times. At any time during the thirty to forty minutes he held her hostage at gunpoint, Lynch could have released the child. He had complete disregard for her terror and suffering, and only heightened it by shooting her mother numerous times in her presence. The totality of the circumstances proves Caday suffered extreme fear and emotional strain just prior to her death, and also must have feared for her own life. Under these facts alone, the trial court properly found HAC.

*Id*. at 369-71 (footnote omitted).

The Supreme Court of the United States has held that "in determining whether a state court's application of its constitutionally adequate aggravating circumstances was so erroneous as to raise an independent due process or Eighth Amendment violation, . . . the . . . standard of review is the 'rational facfinder' standard established in *Jackson v. Virginia*, 443 U.S. 307 (1979)." *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990). Pursuant to *Jackson,* when reviewing an insufficiency of the evidence claim in a habeas petition, a federal court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319; *Owen v. Sec'y for Dep't of Corr.*, 568 F.3d 894, 918 (11th Cir. 2009).

Generally, an "instantaneous or near-instantaneous death by gunfire does not satisfy the aggravating circumstance of heinous, atrocious, or cruel." *Robinson v. State*, 574 So. 2d 108, 112 (Fla. 1991). However, Florida courts have also held that deaths occurring by

shooting can satisfy the HAC aggravator if the State "has presented other evidence to show some physical or mental torture of the victim." *Hartley v. State*, 686 So. 2d 1316, 1323 (Fla. 1996). Florida courts have also held that the HAC aggravator "pertains more to the victim's perception of the circumstances than to the perpetrator's." *Hitchcock v. State*, 578 So. 2d 685, 692 (Fla. 1990), *vacated on other grounds by* 505 U.S. 1215 (1992). "Fear and emotional strain can contribute to the heinousness of a killing." *Id.* at 693 (citing *Adams v. State*, 412 So. 2d 850 (Fla. 1982)).

In *Cave v. State*, 727 So. 2d 227, 229 (Fla. 1998), the Supreme Court of Florida found no error in the trial court's finding of the HAC aggravator where the victim was kidnapped at gunpoint, pled for her life during a fifteen to eighteen minute car ride, and was then shot and stabbed. The court opined that the terror the victim must have felt was sufficient to meet the definition of especially heinous, atrocious or cruel. *Id.* Likewise, in *Farina v. State*, 801 So. 2d 44, 53 (Fla. 2001), the Supreme Court of Florida affirmed the trial court's finding of the HAC aggravator where evidence established that the victim was upset throughout the robbery, had her hands tied, and was conscious while two of her co-workers were shot.

Applying the *Jackson* standard, and giving due deference to the state courts' unrebutted findings of fact, 28 U.S.C. § 2254(e), the Court concludes that a rational factfinder could have found that the killing of Leah Caday was especially heinous, atrocious or cruel. The evidence presented at the penalty phase included Petitioner's statements to the 911-dispatcher, the police negotiator, and detectives, wherein he admitted that he held Caday for approximately thirty minutes until her mother arrived, that he

displayed his gun and she was terrified, and that Caday complied with his requests out of fear. (Ex. A-4 at 147, 165, 192-93.) Virginia Lynch indicated that when Petitioner called her the first time, a woman was screaming in the background. *Id*. at 93. Petitioner called Virginia Lynch a second time and told her he had just shot someone. *Id*. at 97. When Petitioner called Virginia Lynch the third time, he told her he had shot Leah Caday. *Id*. at 101. Thus, Caday clearly saw Petitioner shoot her mother.

Moreover, Morales testified that she observed Petitioner knock on the door of Morgan's apartment and direct the occupant to open the door because Morgan was hurt. At that time, Petitioner was dragging Morgan, who was bloody from the waist down and screaming for help. (Ex. A-4 at 61-62.) Morales subsequently saw the door open, saw Petitioner drag Morgan into the apartment, and then heard three more gun shots about five minutes after the door closed. *Id*. at 63. Likewise, Katherine Sanders, a downstairs neighbor of Morgan and Caday, testified that she heard two shots and then five to seven minutes later, she heard three additional shots. *Id*. at 66-71.

Petitioner also told the police negotiator that after holding Caday in the apartment, Morgan arrived, and he shot her at the front door of the apartment in the leg, then dragged her into the apartment. *Id*. at 192-94. Petitioner similarly told the 911-dispatcher that he shot Morgan and dragged her inside the apartment. *Id*. at 160. Finally, Petitioner admitted to police after the incident that he shot Morgan in front of Caday. (Ex. A-6 at 569-71.)

Similar to the victims in *Cave* and *Farina*, the evidence was sufficient for a rational factfinder to conclude that Leah Caday suffered fear and emotional strain prior to being

shot.  Petitioner has not demonstrated that the state court's denial of this claim was contrary to, or involved an unreasonable application of, *Jackson*.  Accordingly, claim eight is denied pursuant to Section 2254(d).

## I.      Claim Nine

Petitioner maintains that the trial court erred by finding that the murder of Roseanna Morgan was committed in a cold, calculated, and premeditated manner.  In support of this claim, Petitioner maintains that he did not have a carefully crafted plan but instead Morgan's killing was a crime of passion and he was under emotional duress.

Petitioner raised this claim on direct appeal.  The Supreme Court of Florida noted that the evidence supporting the application of the CCP aggravator included Petitioner's statements in the murder-suicide letter written two days before the shooting, his experience with firearms, that he took three firearms to the victims' home, and that he held Caday hostage for approximately thirty minutes before Morgan arrived home.  *Lynch*, 841 So. 2d at 372.  The court continued to reason:

> This Court has held that execution-style killing is by its very nature a "cold" crime.  *See Walls v. State*, 641 So. 2d 381, 388 (Fla. 1994).  In *Looney*, this Court noted the significance of the fact that the victims were bound and gagged for two hours, and thus could not offer any resistance or provocation. 803 So.2d at 678.   Further, the defendants in that case had "ample opportunity to calmly reflect upon their actions, following which they mutually decided to shoot the victims execution-style in the backs of their heads." *Id*.

> Similarly, Lynch's killing of Morgan evinces the element of "cold" necessary for a finding of CCP.  Lynch himself admitted to the 911 operator, the police negotiator, and the police in his post-arrest interview that he shot Morgan in the back of the head, killing her.  Having already been shot at least

four times prior to a final shot to the head, and knowing that her daughter was still in the apartment, Morgan did not offer any resistance or provocation.  Further, witnesses reported a five-to seven-minute delay between the initial shots and the final three after Morgan had been wounded in the initial confrontation.  During this time, Lynch had the opportunity to withdraw or seek help for Morgan by calling 911; instead he calculated to shoot her again, execution-style.  Despite Lynch's subsequent attempted self-serving rationalization that he only wanted to put her out of her misery, the appellant's execution-style murder of Morgan clearly satisfies the "cold" element of CCP.

As to the "calculated" element of CCP, this Court has held that where a defendant arms himself in advance, kills execution-style, and has time to coldly and calmly decide to kill, the element of "calculated" is supported.  *See Hertz v. State*, 803 So. 2d 629, 650 (Fla. 2001); *see also Knight v. State*, 746 So. 2d 423, 436 (Fla. 1998).  Here, Lynch possessed three handguns as he traveled to Morgan's apartment where, after shooting her at least four times near the entrance, he then waited approximately five to seven minutes before shooting her again in the back of the head, execution-style.  Lynch clearly had time to reflect upon these events before firing the final shots; in fact he purposely used a different weapon to shoot her in the head than he had used to inflict the initial wounds.  *See Ford v. State*, 802 So. 2d 1121, 1133 (Fla. 2001) (finding CCP where defendant used three different weapons and had to stop and reload prior to shooting each victim execution-style).  Clearly, in this case a finding of the "calculated" element was proper.

The third element, "heightened premeditation," is also supported by competent and substantial evidence.  This Court has "previously found the heightened premeditation required to sustain this aggravator where a defendant has the opportunity to leave the crime scene and not commit the murder but, instead, commits the murder."  *Alston v. State*, 723 So. 2d 148, 162 (Fla. 1998); *see also Jackson v. State*, 704 So. 2d 500, 505 (Fla. 1997).  In *Alston*, this Court upheld a trial court's finding of CCP where the defendant had ample time to reflect upon his actions and was not under the influence of alcohol, drugs, or the domination or pressure of another person.  *Alston*, 723 So. 2d at 161; *see also Dennis v. State*, 817 So. 2d 741, 765 (Fla. 2002) (upholding CCP where facts showed defendant arrived at apartment before victim and waited for her arrival), *cert. denied*, 537 U.S. 1051, 123 S. Ct. 604, 154 L. Ed. 2d 527 (2002).  Similarly, Lynch had the opportunity to leave the crime scene and not kill Roseanna Morgan.  As in *Dennis*, Lynch arrived at Morgan's apartment and waited for thirty to forty minutes for her to arrive.

During this time, regardless of what his intentions may have been prior to Morgan's arrival, Lynch had ample opportunity to leave the scene. Further, after initially shooting Morgan and then dragging her into the apartment, Lynch had five to seven minutes in which he could have left the scene and not inflicted the final harm. Despite this time to reflect, Lynch chose to shoot Morgan in the head, execution-style, killing her. The evidence of Lynch's actions competently and substantially supports "heightened premeditation."

The final element of CCP is a lack of legal or moral justification. "A pretense of legal or moral justification is 'any colorable claim based at least partly on uncontroverted and believable factual evidence or testimony that, but for its incompleteness, would constitute an excuse, justification, or defense as to the homicide.'" *Nelson v. State*, 748 So. 2d 237, 245 (Fla. 1999) (*quoting Walls*, 641 So. 2d at 388). This Court has refused to find a moral or legal justification where the defendant offered evidence that he killed three people to prevent them from performing legal abortions, *see Hill v. State*, 688 So. 2d 901, 907 (Fla. 1997), and where the defendant offered the justification of wanting to spare his family from having to go through a divorce. *See Zakrzewski v. State*, 717 So. 2d 488 (Fla. 1998). Defendant's attempted justifications for the murder based on Morgan's alleged rejection of him as a lover and her refusal to fully pay a credit card debt are completely without merit or support, and are therefore rejected.

Further, appellant's reliance upon *Almeida v. State*, 748 So. 2d 922 (Fla. 1999), is misplaced. In *Almeida*, the defendant had been consuming alcohol prior to committing the crime, and the trial court found the defendant was "extremely disturbed at the time of the crime" and his ability to "appreciate the criminality of his conduct was substantially impaired." *Almeida*, 748 So. 2d at 933. Appellant argues that his compromised mental health state caused him to believe he was without any other recourse and it rendered him without impulse control. However, the sentencing judge concluded that "defendant was sufficiently in control of his faculties to plan and carry out the murder of Roseanna Morgan." This determination is supported by the evidence. Lynch lay in wait, shot Morgan at least four times, then had the presence of mind to change firearms prior to inflicting the fatal shot. There is no evidence that Lynch was intoxicated. Clearly, this case differs significantly from *Almeida*.

*Id.* at 371-74.

This Court concludes that a rational fact-finder could have found that the killing of

Morgan was cold, calculated, and premeditated pursuant to *Jackson*. 443 U.S. at 319.  The Supreme Court of Florida has held that "[a] defendant can be emotionally and mentally disturbed or suffer from a mental illness but still have the ability to experience cool and calm reflection, make a careful plan or prearranged design to commit murder, and exhibit heightened premeditation."  *Evans v. State*, 800 So. 2d 182, 193 (Fla. 2001) (citing *Sexton v. State*, 775 So. 2d 923, 934 (Fla. 2000)).

The evidence presented in the instant case included the murder-suicide letter which was written by Petitioner two days before the incident.  Even discounting the murder-suicide letter, ample evidence supported the CCP aggravator.  Petitioner admittedly parked his vehicle in a place where the victims' could not see it.  He further took three guns to the victims' apartment, held Caday hostage in the apartment for more than thirty minutes before Morgan came home, and then shot Morgan several times with the Glock, after which he dragged her into the apartment.  After dragging Morgan into the apartment, he waited approximately five minutes before he then retrieved another firearm and shot her in the back of the head.  Finally, Petitioner was able to call Virginia Lynch three times during the course of the incident.  In light of the foregoing, the Court concludes that Petitioner has not demonstrated that the state court's denial of this claim was contrary to, or involved an unreasonable application of, *Jackson*.  Accordingly, ground nine is denied pursuant to Section 2254(d).

### J.    Claim Ten

Petitioner avers that his death sentence is disproportionate in contravention of the

Sixth, Eighth, and Fourteenth Amendments.  Petitioner raised this claim on direct appeal.

The Supreme Court of Florida rejected the claim as follows:

> Here, the trial court properly found three aggravating factors applicable to each murder.  This Court has held that both HAC and CCP are "two of the most serious aggravators set out in the statutory scheme." *Larkins v. State*, 739 So. 2d 90, 95 (Fla. 1999).  Further, the trial court found one statutory mitigator,[FN8] and eight nonstatutory mitigators.[FN9]  Appellant asks this Court to reweigh the evidence and give each aggravating factor less weight, and afford each mitigating factor greater weight.  However, Judge Eaton properly outlined the support for all of his factual findings, and the evidence supports his conclusions.  Each aggravating factor is supported by competent, substantial evidence, and there is nothing to suggest he abused his discretion in determining the weight that should be given to each aggravating and mitigating factor.  *See Sexton v. State*, 775 So. 2d 923, 934 (Fla. 2000) (holding abuse of discretion standard applicable in determining if trial court afforded proper weight to aggravating factor); *Cole v. State*, 701 So. 2d 845, 852 (Fla. 1997) (holding trial court's decision as to weight given to mitigating factors is subject to abuse of discretion standard).

>> FN8.  The defendant has no significant history of prior criminal activity. The trial court found this element proven, but in light of the fact that this was a double murder, afforded it only little weight.

>> FN9.  As to the remaining eight nonstatutory mitigators, the trial court afforded three "moderate" weight, and five "little" weight.  It must be noted that in the body of his written sentencing order, Judge Eaton included a tenth mitigator-"When possible, the defendant has sought gainful employment"-and afforded it little weight.  However, Judge Eaton did not include this mitigator in his oral pronouncement or in the summary of his written sentencing order, and therefore it is not considered here.

> This Court does not recognize a domestic dispute exception in connection with death penalty analysis.  The State correctly asserts that Lynch had no domestic dispute with Caday, and therefore any such exception could not be even remotely considered or applicable to her murder.  Further, there is competent and substantial evidence within the

record which supports the finding of the CCP aggravator as to Morgan's murder. It is impossible to reconcile application of the CCP aggravator with a domestic dispute exception, and therefore it is likewise impossible to apply any such domestic dispute exception to Morgan's murder.

As we compare other cases decided by this Court, the death penalty is clearly applicable to both murders here. *See Smithers v. State*, 826 So. 2d 916, 931 (Fla. 2002) (upholding death sentence in double homicide where two aggravators, previous felony and HAC, two statutory mitigators, and seven nonstatutory mitigators were applicable to second victim); *Morton v. State*, 789 So. 2d 324, 328-29 (Fla. 2001) (upholding death sentence in double homicide where three aggravators, CCP, avoiding arrest, and committed while engaged in a felony, two statutory and five nonstatutory mitigating factors were applicable to one victim); *Robinson v. State*, 761 So. 2d 269, 272-73 (Fla. 1999) (upholding death sentence where trial court found three aggravating factors, pecuniary gain, avoiding arrest, and CCP, two statutory mitigating factors, and eighteen nonstatutory mitigating factors).

Lynch inflicted two deaths in the home of the victims, and had the opportunity to carefully reflect and consider his actions before both killings. This is not a case of a domestic dispute gone bad - this is a case of a murder-suicide plot that was only partially completed. Lynch had knowledge of and experience with firearms - this cannot be considered an accidental shooting. The trial court properly sentenced Richard Lynch to death for the murders of a thirteen-year-old girl and her mother.

*Lynch*, 841 So. 2d at 377-78.

The Eleventh Circuit Court of Appeals has held:

A federal habeas court should not undertake a review of the state supreme court's proportionality review and, in effect, "get out the record" to see if the state court's findings of fact, their conclusion based on a review of similar cases, was supported by the "evidence" in the similar cases. To do so would thrust the federal judiciary into the substantive policy making area of the state.

*Moore v. Balkcom*, 716 F.2d 1511, 1518 (11th Cir. 1983). In considering this claim, the

Supreme Court of Florida conducted a proportionality analysis and determined that no

resentencing was warranted.  This procedure was not done arbitrarily or capriciously and provided an adequate safeguard of Petitioner's rights.  This Court does not have the authority to infringe on the state court's determination.  Moreover, even if this claim was subject to federal habeas review, the state court's decision is neither contrary to, nor an unreasonable application of, clearly established federal law.  Furthermore, the decision did not rest upon an unreasonable determination of the facts.  Pursuant to Section 2254(d), federal habeas relief is not warranted for this claim.

### K.    *Claim Eleven*

Petitioner contends that appellate counsel rendered ineffective assistance by failing to argue on appeal that (1) the factual basis was not sufficient for the offenses, and (2) the burglary and kidnapping convictions were not proven by the State.  (Doc. No. 1 at 49-58.) Petitioner raised these claims in his state habeas petition in the Supreme Court of Florida.

The Supreme Court of Florida denied these claims for the same reasons given for denying Petitioner's claims of ineffective assistance of counsel in relation to the guilt phase. *Lynch*, 2 So. 3d at 84.  The court concluded:

> Trial counsel and Lynch were aware at the time of his plea that the State possessed more than enough evidence to prove Lynch's guilt for all four counts of the indictment, and the facts elicited during the penalty-phase proceedings establish Lynch's commission of these offenses.  Appellate counsel cannot be ineffective for failing to raise a meritless issue on appeal. *See Lawrence v. State*, 831 So. 2d 121, 135 (Fla. 2002); *see also Kokal v. Dugger*, 718 So. 2d 138, 142 (Fla. 1998) ("Appellate counsel cannot be faulted for failing to raise a nonmeritorious claim.").  Furthermore, Lynch could have, and actually did, include the substance of this habeas claim in his rule 3.851 motion; therefore, habeas relief is an improper remedy in this instance. *See Rutherford*, 774 So. 2d at 643.

*Id.* at 85.

As discussed in claim five *supra,* Florida courts have noted that "[t]he purpose of the factual basis is to avoid a defendant mistakenly pleading to the wrong offense. To preclude this possibility, the trial judge has considerable discretion to determine whether there is a factual basis for a plea." *Blackwood,* 648 So. 2d at 295 (quoting *Suarez,* 616 So. 2d at 1068, citing *Williams v. State,* 316 So. 2d 267). If the state court "file contains substantiation of the factual basis, the [state trial] court may deny [a post-conviction] motion by attaching those documents to the order of denial. Depositions or police affidavits have been determined to fulfill this obligation." *Farran,* 694 So. 2d at 878 (citing *Washington,* 688 So. 2d 416 n.2). Moreover, in Florida, "[i]n order to withdraw a guilty plea after sentence for lack of factual basis, a defendant must show prejudice or manifest injustice." *Blackwood,* 648 So. 2d at 295 (quoting *Suarez,* 616 So. 2d at 1068, citing *Williams,* 316 So. 2d at 275, and *Grant,* 316 So. 2d 282).

The record reflects that the trial court read the charges in the indictment at the plea hearing, and Petitioner affirmed that he understood the charges. Moreover, defense counsel provided a sufficient factual basis for the charges of murder under state law. The prosecution also prepared a factual basis, which was filed in the court on the day of the plea and which sufficiently provided a factual basis for all of the offenses under Florida law. Furthermore, the evidence of Petitioner's guilt presented at the penalty-phase was substantial, and Petitioner's convictions for armed burglary and kidnapping were supported by the evidence as found by the Supreme Court of Florida pursuant to state law.

122

Given (1) the trial court's reading of the charges from the indictment prior to accepting Petitioner's plea, (2) defense counsel's and the prosecution's factual bases provided to the trial court, and (3) the evidence presented at the penalty phase, Petitioner has not established that appellate counsel rendered deficient performance by failing to challenge the factual basis for the plea or by failing to challenge the sufficiency of the evidence for the armed burglary and kidnapping convictions. Additionally, Petitioner has not shown that a reasonable probability exists that the outcome of his appeal would have been different had appellate counsel raised these issues on appeal. Accordingly, this claim is denied pursuant to Section 2254(d).

### L.    Claim Twelve

Petitioner contends that he may be incompetent at the time he is scheduled to be executed, and therefore his execution would violate the Eighth Amendment. Petitioner raised this claim in the state courts, and the Supreme Court of Florida denied the claim because it was not ripe. *See Lynch*, 2 So. 3d at 85. The Supreme Court of the United States had held that a *Ford*[18] claim does not become ripe until the prisoner's execution is imminent. *See Panetti v. Quarterman*, 551 U.S. 930, 946-47 (2007). Thus, claim twelve is dismissed without prejudice to Petitioner's right to raise the issue when it becomes ripe for adjudication.

### M.    Claim Thirteen

---

[18]*Ford v. Wainwright*, 477 U.S. 399 (1986) (holding that "the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane.").

Petitioner asserts that the cumulative procedural and substantive errors deprived him of a fair trial and appeal. Petitioner relies on all of his aforementioned claims to support the instant claim.

Petitioner raised this claim in his state habeas petition. The Supreme Court of Florida denied relief as follows:

> Finally, Lynch contends that the cumulative range of error that occurred during his trial, appeal, and postconviction proceedings unfairly and unconstitutionally dictated the imposition of the death penalty and that he is accordingly entitled to habeas relief. However, we have consistently held that "where individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error must fail." *Griffin v. State*, 866 So. 2d 1, 22 (Fla. 2003); *see also Dufour v. State*, 905 So. 2d 42, 65 (Fla. 2005) ("[The appellant] is not entitled to relief on his cumulative error claim because the alleged individual claims of error are all without merit, and, therefore, the contention of cumulative error is similarly without merit."). All of the claims that Lynch has presented are either procedurally barred or without merit.

*Lynch*, 2 So. 3d at 86.

The Eleventh Circuit Court of Appeals has recognized that in reviewing a habeas petition, "[a] piecemeal review of each incident does not end our inquiry. We must consider the cumulative effect of these incidents and determine whether, viewing the trial as a whole, appellants received a fair trial as is their due under our Constitution." *United States v. Blasco*, 702 F.2d 1315, 1329 (11th Cir. 1983). Nevertheless, "the Eleventh Circuit has never expressly recognized a freestanding 'cumulative effect' claim, based upon the assertion that alleged errors of the trial court, defense counsel, or the State, or a combination thereof, rendered the trial fundamentally unfair even though such errors were

124

individually harmless or non-prejudicial, as cognizable under § 2254." *Purifoy v. Tucker,* No. 3:10cv312/LAC/EMT, 2012 WL 1933769, 26 (N.D. Fla. May 3, 2012).    Thus, "cumulative error analysis should evaluate only matters determined to be in error, not the cumulative effect of non-errors." *Id.* (citing *United States v. Waldon*, 363 F.3d 1103, 1110 (11th Cir. 2004)); *see also United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990) ("[A] cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.").    Consequently, Petitioner must demonstrate error with respect to at least two of his individual claims. *Id.* at 27.

After reviewing the proceedings and considering the claims collectively, this Court cannot say that the guilt or penalty phase of Petitioner's "trial, as a whole, was fundamentally unfair and outside the bounds of the Constitution." *Conklin v. Schofield*, 366 F.3d 1191, 1210 (11th Cir. 2004).  Instead, the Court concludes that relief is warranted only as to the single claim addressed in claim one *supra*.  Petitioner has not met his burden of proving that the state court either unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in denying this claim.  Accordingly, claim thirteen is denied pursuant to Section 2254(d).

## V.    CONCLUSION

The Court finds that Petitioner is entitled to habeas relief on claim one (a), that counsel rendered ineffective assistance during the penalty phase by advising Petitioner to waive a penalty-phase jury prior to conducting an adequate mental health investigation and advising Petitioner of his cognitive impairment.  The remaining claims are denied.

Any of Petitioner's allegations not specifically addressed herein are determined to be without merit.

## VI.    *CERTIFICATE OF APPEALABILITY*

A prisoner seeking to appeal a  district court's final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal but must obtain a certificate of appealability ("COA").  28 U.S.C. § 2253(c)(1); *Harbison v. Bell*, 556 U.S. 180 (2009).  "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make such a showing, petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) or, that "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Petitioner has not made the requisite showing in these circumstances. The Court will deny Petitioner a certificate of appealability.

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.    The Petition for Writ of Habeas Corpus filed by Richard E. Lynch (Doc. No. 1) is **GRANTED in part and DENIED in part**.

2.    The Court determines that claim 1, subclaims (B), (C), (D) (E) and claims 2 through thirteen are without merit.  Habeas relief is **DENIED with prejudice** with regard to these claims.

3.    The writ of habeas corpus will be conditionally **GRANTED** with regard to

claim 1, subclaim (A) for the reasons discussed above, within **NINETY (90) DAYS** from the date of this Order, unless the State of Florida initiates a new sentencing proceeding in state court consistent with the law.

4.      The Clerk of the Court shall enter judgment accordingly and is directed to close this case.

**DONE AND ORDERED** at Orlando, Florida, this 25th day of September, 2012.

Charlene Edwards Honeywell
United States District Judge

Copies to:
OrlP-1 9/25
Counsel of Record
Richard E. Lynch